IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA ROMAR, a minor suing through her mother and legal representative, CORA ROMAR,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER, and DR. THOMAS MANSFIELD,<br><br>　　　　　　Defendants. | CIV F 03-6668 (NEW DJ) AWI SMS<br><br>ORDER ON<br>DR. MANSFIELD'S MOTION<br>FOR SUMMARY JUDGMENT |

　　　　This case arises out of three presentations on December 10, 12, and 14, 2002, by minor Plaintiff Christina Romar ("Christina") to the emergency department of Co-Defendant Fresno Community Hospital ("FCH"), where she was seen by Co-Defendant Dr. Thomas Mansfield. Among other things, Christina had bilateral periorbital swelling (swelling around both eyes). It was suspected that Christina was suffering from an allergic reaction and she was discharged with orders to return to FCH and with prescriptions to treat an allergic reaction. On December 17, 2002, Children's Hospital determined that Christina had sinus abscesses and infections. Christina had a very difficult course at Children's Hospital and received multiple treatments to combat the bacterial processes that had spread throughout her body. After weeks at Children's Hospital, Christina was discharged but suffered permanent injury due to the bacterial processes. On November 24, 2003, Christina, through her mother Cora Romar ("Cora"), brought suit

against FHC and Dr. Mansfield for violations of 42 U.S.C. § 1395dd (the Emergency Medical Treatment and Active Labor Act ("EMTALA")), and state law medical malpractice.  Dr. Mansfield moves for summary judgment on Christina's malpractice claim, which is the only claim asserted against him.  For the following reasons, Dr. Mansfield's motion will be granted.

## BACKGROUND

*General Background*[1]

On December 10, 2002, Christina was seen at the FCH Emergency Department with a chief complaint of fever and cold symptoms.  Christina's vital signs were assessed, she was given Tylenol, and was then seen by a physician's assistant who noted that Christina had fever, cough/congestion, fussiness, a runny nose with clear drainage, and was pulling her ears.  Christina's ocular exam was normal.  The physician's assistant examined Christina's ears and noted that the left ear showed tympanic erythema and loss of tympanic membrane landmarks.  The assistant's clinical impression was fever and otitis media of the left ear.  Christina was prescribed Tylenol, amoxocillin, and Pedia Care, and Cora was instructed on the medication and told to follow up with Christina's primary care physician in two to three days.

On the morning of December 12, 2002, Christina returned to FCH's emergency department complaining of bilateral periorbital swelling that had onset that day.  Cora asked FHC personnel if the swelling could have been a reaction to medication.[2]  See Cora Romar Deposition at 67:21-68:11, 71:8-11.  Christina's temperature had improved since December 10 and her ears and throat appeared unremarkable.  The nurse practitioner who evaluated Christina, Alan Orme, believed that Christina was suffering from an allergic reaction from an uncertain source.

---

[1] Christina has not submitted separate undisputed material facts, and Dr. Mansfield has presented only four undisputed material facts in support of his motion.  The basic background appears to be relatively undisputed.  The basis for the general background section comes from the briefs of the parties and the detailed declaration of Dr Mansfield's expert, Dr. George Sternbach, which includes a review and description of the medical records.

[2] The medical records state, "mother thinks poss. medication reaction."  Casheros Declaration Exhibit B.

Christina was prescribed Decadron (an anti-inflammatory) and Benadryl (an antihistamine) and the previously ordered amoxicillin and Pedia Care were ordered discontinued.[3] That afternoon, Christina was discharged with instructions to return to the emergency department at 8:00 p.m. to be seen by Dr. Mansfield for reevaluation of the suspected allergic reaction. Dr. Mansfield is a physician who specializes in emergency medicine and was asked by Orme to look at Christina in preparation for her return visit that evening. See Mansfield Deposition at 9:19-10:7. No CBC, blood differential, blood and urine cultures, CT scans, or sedimentation rate tests were ordered for Christina on December 12, 2002. Both sides agree that Dr. Mansfield had no contact with Christina after December 12, 2002.[4]

On the evening of December 14, 2002, Christina returned to FCH complaining of bilateral eye swelling and swelling to the forehead. Christina's eyes were swollen with crusty discharge. The nurse practitioner who examined Christina had the clinical impression of allergic reaction and acute angio-edema. Christina was discharged with instructions to continue her previously ordered course and to return if symptoms worsened.

On December 17, 2002, Christina was taken to Pediatrics Plus, where she was transferred to Children's Hospital in Madera. Christina initially appeared non-toxic. A CT scan and blood work revealed sinus abscesses and infections. Tragically, Christina's infections spread from her sinuses to the soft tissues in her face and into her bloodstream. Christina spent weeks in the hospital undergoing various treatments, including surgeries, to combat the infectious processes afflicting her. Christina eventually recovered and was discharged, but has suffered permanent injury because of the infection and related complications and treatments.

*Deposition of Dr. Mansfield*

In his deposition, Dr. Mansfield testified that he did not review Christina's chart, but that

---

[3] The order discontinuing the amoxicillin was signed by Orme. See Mansfield Deposition at 34:12-17.

[4] There is a conflict between Dr. Mansfield and Cora whether Christina returned on the evening of December 12. Dr. Mansfield testified that Christina returned the night of December 12, but Cora testified that she did not. As discussed in footnote 12, *infra*, this conflict will not change the result of this motion.

3

Orme described the case to him and the reasons for asking Cora to bring Christina back. See Mansfield Deposition at 10:2-7. Dr. Mansfield testified that Orme told him that Christina had been on amoxicillin for an ear infection, that Christina's ears no longer looked infected, that Christina had no significant temperature,[5] that Christina had developed swelling that was believed to be an allergic reaction to the amoxicillin, that the amoxicillin was stopped, and that Christina was being treated for the allergic reaction. See id. at 12:6-13:21,[6] 14:18-25. Dr. Mansfield testified that Orme explained that Orme had asked Cora to return for an allergic reaction and that Orme wanted Dr. Mansfield to "look at [Christina] when they're being discharged so [Dr. Mansfield would] have a basis of comparison when they came back." Id. at 9:19-10:1. When Christina came back, Dr. Mansfield was going to make sure that there was no worsening of the allergic reaction. See id. at 30:18-31:2. Further, Dr. Mansfield testified that Orme had told him that Orme had been working with Dr. James Osborne in evaluating and treating Christina, and that Orme and Osborne "had decided on the course of action and treatment of [Christina]." Id. at 15:16-16:16. Dr. Mansfield stated that he performed a visual inspection of Christina that lasted approximately one minute. See id. at 10:8-17. Dr. Mansfield testified that Christina's eyelids were swollen in a manner consistent with an allergic reaction. See id. at 11:8-10. Further, Dr. Mansfield testified that he was not asked for a consultation by Orme. See id. at 18:1-15. Dr. Mansfield explained, "when we use consult, we mean an official evaluation, independent evaluation of a patient . . . and my evaluation was not to be a consultation, it was to be a visual experience of this is the way the child is now, we're treating her this way, she's going to come back in several hours to see if there's any worsening." Id. Dr.

---

[5] Further, Dr. Mansfield was not told about Christina's fever on the prior admission of December 10. See Mansfield Deposition at 15:11-15.

[6] Specifically, Dr. Mansfield testified that he was told:
"That the patient had been on an antibiotic and developed the swelling after the antibiotic and was believed to be reaction to that antibiotic . . . [Orme] mentioned that the child had been in for an upper respiratory infection and was placed on amoxicillin for an ear infection, and that's why they were on amoxicillin, however, now the child's ears did not look infected and appeared there was an . . . allergic reaction to the antibiotic, so we stopped the antibiotic and was treating the allergic reaction."

4

Mansfield agreed that, in looking at Christina, if he saw something that was inconsistent or not in accord with the diagnosis he had been told, that is allergic reaction, he could have done something different. See id. at 23:14-24:12. Dr. Mansfield had the ability to order blood tests and a urine analysis if he determined from his observation of Christina that such tests were necessary. See id. at 27:6-17, 30:3-10. Finally, Dr. Mansfield testified that he agreed with the decision for Christina to stop taking amoxicillin.[7] See id. at 35:1-6.

*Declaration of Dr. George Sternbach*

Dr. George Sternbach is a board certified emergency medicine physician and is Dr. Mansfield's standard of care expert. Dr. Sternbach has filed a declaration in which he opines that Dr. Mansfield complied with the standard of care in all respects in providing care and treatment to Christina. See Sternbach Declaration at ¶ 11. With respect to December 12, 2002, Dr. Sternbach declares:

> (c)  . . . Christina presented to [FCH] with bilateral periorbital swelling. However, unlike two days earlier, Christina did not have a fever and visualization of her ears were unremarkable demonstrating that the previously noted tympanic membrane erythema and loss of tympanic membrane landmarks were resolving. Thus, it appeared that Christina's initial fever was likely caused by the ear infection, which seemed to be responding to the Amoxicillin, and that the periorbital edema was likely the result of an allergic reaction as opposed to any infectious process.
>
> (d)   Additionally, given the fact that Christina presented on December 12, 2002, with *bilateral* periorbital edema further points to an allergic reaction as the source of the edema, as opposed to any occult infection. This is so because generally, when children present with infections of the sinuses around the eyes, it is usually localized to one particular eye as opposed to bilaterally. Thus, the diagnosis of allergic reaction to the Amoxicillin (an antibiotic that commonly gives rise to an allergic response) was a diagnosis that was supported by the clinical findings.
>
> (e)   According to Dr. Mansfield's testimony, only at this point did he become involved in Christina's care. Specifically, Dr. Mansfield re-evaluated her periorbital edema following the discontinuance of the suspect medications and after the Benadryl and anti-inflammatory treatment had been initiated. In this

---

[7]Christina's counsel initially asked whether Dr. Mansfield gave the instruction to stop the amoxicillin and Pediacare, to which he responded "no," that the instruction was written by Orme. See Mansfield Deposition at 34:12-17. Christina's counsel then asked whether Dr. Mansfield recommended that Cora stop the amoxicillin, but then changed the question to whether he concurred that the patient should stop taking amoxicillin. See id. at 34:20-35:4. Dr. Mansfield then asked if the question was did he agree with cessation of amoxicillin. When Plaintiff's counsel answered in the affirmative, Dr. Mansfield then answered "yes." See id. at 35:5-7.

regard, Dr. Mansfield initially evaluated Christina at approximately 2:30 p.m. on December 12, 2002, to determine a baseline for the periorbital edema.  Then, at 8:00 p.m. that evening, Christina returned to Dr. Mansfield, who then determined that the periorbital edema had remained unchanged.  This stable status of the periorbital edema was further confirmed by Christina's mother.  Thus, seeing no worsening of the periorbital edema, Dr. Mansfield was within the applicable standard of care to discharge Christina with instructions to continue the previous orders and follow-up with her primary physician.

(f)    Similarly, based upon the deposition testimony of Cora Romar, if Dr. Mansfield never saw Christina on the evening of December 12, 2002, the only time when Dr. Mansfield could have rendered any care and treatment to Christina, then, logically, no action or inaction on the part of Dr. Mansfield could be characterized as falling below the standard of care since he never saw Christina.

Id. at ¶ 11(c)-(f).

*Declaration and Deposition of Plaintiff's Expert Dr. Peggy Goldman*

Dr. Peggy Goldman is a board certified emergency medicine and infectious diseases physician and is Christina's expert for both the standard of care and causation.  Dr. Goldman provided a declaration in connection with Christina's Rule 26 disclosures.  After stating that she had reviewed enough records to form opinions to "a reasonable degree of medical probability," Dr. Goldman declared in relevant part that:

4.    [I]t is my opinion that the screening examination and emergency treatment plaintiff received at [FCH] on December 10-14, 2002, and from defendant Dr. Mansfield on December 12, 2002, departed from the applicable standard of care and were inappropriate as that term is defined under [EMTALA].  Specifically, the history obtained from the plaintiff during her emergency admissions raised a significant possibility that she was suffering from a virulent bacterial infection that would constitute a most serious emergency condition.  This prospect should have been recognized by competent emergency medical practitioners based on the history obtained from plaintiff and her presentation upon being examined during her emergency admissions.

5.    Under the circumstances presented by plaintiff . . ., an acceptable and appropriate medical screening had to include, at minimum, a CBC, blood differential, blood and urine cultures, a CT scan, and a sedimentation rate, none of which were ordered or done as part of any of the plaintiff's emergency screening examinations . . . [and these tests] had to be ordered and done without delay.

7.    The plaintiff also did not receive stabilizing treatment in accordance with applicable standards of care and EMTALA.  A patient with plaintiff's history and presentation required the administration of suitable intravenous antibiotics at the earliest possible time, and the patient's admission to the hospital had to be fully considered by a reasonably prudent practitioner as well.  The failure of the defendants to provide necessary and required stabilizing treatment resulted in plaintiff being discharged in an unstable condition, i.e. her being discharged with

6

> a virulent, uncontrolled bacterial infection.
>
> 8.   The failure to provide a screening examination and stabilizing treatment in accordance with the standard of care and EMTALA under these circumstances creates an unacceptable risk of failing to identify and treat a potentially virulent bacterial process in a timely manner.  This failure had disastrous results in plaintiff's case.
>
> 9.   Specifically, plaintiff had a reasonable medical probability of a better outcome . . . had she received an acceptable and appropriate screening examination and stabilizing treatment for the virulent bacterial process with which she presented in December 2002 . . . .

January 2006 Goldman Declaration at ¶¶ 4-5, 7-9.

In her deposition, Dr. Goldman opined that the care Christina received on December 10 did not fall below the standard of care.  See Goldman Deposition at 31:20-32:6.  Dr. Goldman testified that, on December 12, the standard of care required Christina to receive a CBC, a blood differential, a blood culture, a sedimentation rate, a consultation with a specialist, imaging tests, and the administration of intravenous antibiotics.  See id. at 41:19-42:22.  Dr. Goldman stated that it was a breach of the standard of care to not order a replacement medication for the amoxicillin if the health care providers believed that Christina had a serious ear infection.  See id. at 50:7-22.  However, Dr. Goldman testified that the standard of care did not require the administration of a chest x-ray or urine tests on December 12.  See id. at 42:7-16.  Dr. Goldman also stated that, to her knowledge, Christina did not return to FCH on the evening of December 12, but did return on December 14.  See id. at 57:1-3.

Additionally, at the beginning of Dr. Goldman's deposition, Christina's counsel indicated that there had been confusion by Dr. Goldman and that, since FCH noticed the deposition, Dr. Goldman had not prepared to offer opinions regarding Dr. Mansfield.[8]  Goldman Deposition at 8:23-9:7.  After FCH's counsel asked questions, Dr. Mansfield's counsel asked two questions:

---

[8]In reply, Dr. Mansfield has presented e-mail correspondences between himself and Christina's counsel.  The correspondence from Christina's counsel is in regard to the expert discovery requested by Christina.  See Dr. Mansfield's Reply Exhibit C.  Christina's counsel indicates that he wants the documents produced so that the deposition of Dr. Goldman may go forward.  See id.  Dr. Mansfield's responded that Dr. Sternbach's and a Dr. Tureen's documents had been produced to Christina and then requested Christina confirm that there would be no impediment for Dr. Goldman's deposition going forward.  See id.  This suggests that the parties's respective counsel envisioned or anticipated that Dr. Goldman would discuss her opinions regarding Dr. Mansfield at her deposition.

7

| | | |
|---|---|---|
| Q: | | **Is it correct that today you are not prepared or not able to render any opinion as to whether to a reasonable medical probability whether Dr. Mansfield complied with the standard of care?** |
| A: | | Yes, that's correct. |
| Q: | | **Okay. Between now and the time of trial, if you do have – if you do obtain the necessary information to render such an opinion, would you agree that you will notify your counsel of that?** |
| A: | | Yes. |

Id. at 83:21-84:5.  Plaintiff's counsel then indicated that he would make Dr. Goldman available for further deposition.  Id. at 84:6-20.  To the Court's knowledge, no other deposition of Dr. Goldman was noticed or otherwise occurred.

## LEGAL STANDARDS

*Summary Judgment Standard*

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F.Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

8

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

9

391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 650 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Rule 56(c); Fortyune, 364 F.3d at 1079-80. The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

10

show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

*California Medical Malpractice Standards*

In a medical malpractice action, the plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."  Tortorella v. Castro, 140 Cal.App.4th 1, 3 n.2 (2006); Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999).  "The standard of care in a medical malpractice case requires that medical service providers exercise that . . . degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."  Barris v. County of Los Angeles, 20 Cal.4th 101, 108 (Cal. 1999); Landeros v. Flood, 17 Cal.3d.399, 408 (1976).  "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to prove or disprove that the defendant performed in accordance with the standard prevailing of care unless the negligence is obvious to a layperson."  Johnson v. Superior Court, 143 Cal.App.4th 297, 305 (2006); see Flowers v. Torrance Mem'l Hosp. Medical Ctr., 8 Cal.4th 992, 1001 (Cal. 1994); Landeros, 17 Cal.3d at 410.  When a defendant supports a motion for summary judgment with expert testimony that his conduct fell within the community standard of care, the failure of a plaintiff to present conflicting expert opinion is fatal to the plaintiff's medical malpractice claim.  See Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir. 1988); Hanson, 76 Cal.App.4th at 607; Jambazian v. Borden, 25 Cal.App.4th 836, 844 (1994); Willard v. Hagemeister, 121 Cal.App.3d 406, 412 (1981).

11

**DR. MANSFIELD'S MOTION**

*Defendant's Argument*

Dr. Mansfield's argues that the declaration of his standard of care expert, Dr. Sternbach, shows that he did not breach the standard of care. Dr. Sternbach declared that at all times, Dr. Mansfield met the standard of care. Thus, there was no breach of duty. Also, in reply, Dr. Mansfield argues that reliance on Dr. Goldman's deposition is inappropriate because Dr. Goldman stated that her deposition testimony did not apply to Dr. Mansfield. Further, reliance on Dr. Goldman's declaration is inappropriate because it conflicts with her deposition testimony, is ambiguous because the declaration discusses the three FCH presentations collectively as a single unit even though Dr. Mansfield only saw Christina on December 12, and the declaration is conclusory and does not provide a factual basis for finding a breach of the standard of care.

*Plaintiff's Opposition*

Christina argues that there is a disputed issue of material fact as to whether Dr. Mansfield breached the applicable standard of care. The dispute is due to the declaration and deposition testimony of Dr. Goldman. In Dr. Goldman's declaration, she opines that Dr. Mansfield failed to meet the applicable standard of care with respect to the care and treatment provided to plaintiff. See Goldman Declaration at ¶¶ 3-9. Specifically, Dr. Goldman opines that Dr. Mansfield should have recognized the emergency condition of Christina based on Christina's history and presentation upon being examined by Dr. Mansfield. Id. Christina should have received stabilizing treatment in accordance with the applicable standards of care: her history and presentation required the administration of suitable intravenous antibiotics at the earliest possible time. When Dr. Mansfield saw plaintiff in connection with being asked about plaintiff by Physician's Assistant Orme, Dr. Mansfield concurred that Christina's amoxicillin should be discontinued due to an allergic reaction. See Mansfield Deposition at 34:12-35:7. "Because Mansfield was Christina's treating physician, and had the ability to exercise independent judgment in treating a virulent bacterial infection not in accord with an allergic reaction, Mansfield failed to provide stabilizing treatment in accordance with the standard of care."

12

Plaintiff's Opposition at 18:9-12 (citing Goldman Declaration at lines 19-22).

In anticipation of objections and argument with respect to Dr. Goldman's deposition and declaration, Christina argues that Dr. Goldman opined at her deposition that the standard of care required Christina to received ancillary laboratory tests, including a complete blood count, a blood differential, a blood culture, a sedimentation rate, a consultation with a specialist, and the administration of intravenous antibiotics on December 12 and 14, 2002. See Goldman Deposition at pp. 41-42, 49, 63. Dr. Goldman also opined that it was below the standard of care for Christina to be taken off of amoxicillin on December 12 without some other antibiotic being prescribed. See id. at pp. 50-51. Normally a witness's deposition testimony supersedes or overrides the contents of a declaration submitted in opposition to a motion for summary judgment. However, "These opinions that Dr. Goldman rendered as to plaintiff's malpractice claim, even though not specific as to Dr. Mansfield, are clearly applicable to him as well as FCH and thus are sufficient to preclude summary judgment in favor of [Dr. Mansfield]." Plaintiff's Opposition at 19:17-19.

*Discussion*

Dr. Mansfield's motion for summary judgment is supported by a board certified emergency medicine physician who opines, in not insignificant detail, that Dr. Mansfield did not breach the standard of care. See Sternbach Declaration at ¶ 11. This expert evidence shifts the burden to Christina to present her own expert medical evidence regarding the standard of care. Hanson, 76 Cal.App.4th at 607. To do this, Christina is relying on the January 2006 declaration and August 2006 deposition of Dr. Goldman, also a board certified emergency medicine physician. However, Christina's reliance on the testimony/opinions of Dr. Goldman, as they are currently presented, is problematic.

The Court is troubled by the testimony that Dr. Goldman gave in comparison with her declaration. With the exception of the urine analysis, Dr. Goldman held to the opinion in her deposition that the failure to order a CBC, blood cultures, sedimentation rates, blood differential, and imaging tests on December 12, 2002, was a breach of the standard of care. See Goldman

13

1  Deposition at 41:19-42:22.  This is generally consistent with Dr. Goldman's declaration.  See
2  January 18, 2006, Goldman Declaration at ¶ 5.  However, in January 2006, Dr. Goldman
3  indicated to a reasonable medical probability that Dr. Mansfield breached the standard of care by
4  not ordering these tests, but could not so testify under oath during the August 2006 deposition.
5  Christina recognizes that deposition testimony normally supersedes declarations submitted
6  during summary judgment, but argues that Dr. Goldman's deposition opinion also clearly apply
7  to Dr. Mansfield.  The problem is Dr. Goldman's response to the questions by Dr. Mansfield's
8  counsel.  Dr. Goldman agreed that, at the deposition, she was not prepared or not able to render
9  any opinion to a reasonable medical probability whether Dr. Mansfield complied with the
10 standard of care.  See Goldman Deposition at 83:21-25.  Her response is an unqualified, "yes,
11 that is correct."  Id. at 83:25.  There is no qualification that one of the breaches identified during
12 the deposition would also be applicable to Dr. Mansfield.  In fact, her agreement or
13 acknowledgment that she was not prepared or not able to render standard of care testimony about
14 Dr. Mansfield at the deposition is tantamount to saying that she did not intend for her standard of
15 care opinions to apply to Dr. Mansfield.  To apply the standard of care opinions given at her
16 deposition to Dr. Mansfield would be improper in light of her unqualified agreement that she was
17 not able to render such opinions.  Since the standard of care opinions in the declaration are
18 similar to those of the deposition, there is a tension and conflict between the two.

19     The tension between Dr. Goldman's deposition and declaration is exacerbated by the fact
20 that the January 2006 declaration no longer accurately reflects Dr. Goldman's opinions in this
21 case.  The January 2006 declaration states that EMTALA was violated and the standard of care
22 was breached on December 10, 12, and 14, 2002.  See January 18, 2006, Goldman Declaration at
23 ¶ 4.  However, in her deposition, Dr. Goldman is now of the opinion that the standard of care was
24 not breached on December 10.  See Goldman Deposition at 31:20-32:6.  Also, Dr. Goldman's
25 declaration indicates that the standard of care was breached on December 10, 12, and 14, when
26 Christina did not receive, *inter alia*, a urine culture.  See January 18, 2006 Goldman Declaration
27 at ¶¶ 5, 8.  However, in her deposition, Dr. Goldman is now of the opinion that on December 12

14

it was not a breach of the standard of care when Christina did not receive "urine tests."[9]  See Goldman Deposition at 42:7-16.

Also, as Dr. Mansfield correctly points out in reply, Dr. Goldman's January 2006 declaration does not discuss Christina's presentations to FCH "individually."  Instead, the declaration is in terms of "the presentations" and seems to group the December 10, 12, and 14 presentations together.  An individualized discussion of December 12, or a more detailed discussion regarding Dr. Mansfield, is not included in Dr. Goldman's declaration.[10]  A more individualized discussion by Dr. Goldman would be appropriate given the apparent involvement of Dr. Mansfield with Christina.  Dr. Mansfield's testimony is not contradicted with respect to what he was asked to do or his conduct on the afternoon of December 12.  Dr. Mansfield's deposition indicates that he was told that Christina's ears no longer looked infected, that there was no significant temperature,[11] that there was an allergic reaction to amoxicillin, that Christina was taken off amoxicillin and being treated for an allergic reaction, and that it had been requested that Christina return that evening.  Dr. Mansfield's deposition indicates that he was asked to look at the level of swelling to ensure that the swelling was not worse upon her return visit and that he looked at her for about one minute to see the level of swelling.  Dr. Mansfield's testimony indicates that it was Orme and Osborne who obtained the history from Cora and that it was Orme and Osborne who actually evaluated, diagnosed and set the course of treatment.  Dr. Mansfield's testimony does not indicate that he set a course of treatment, made recommendations, reviewed Christina's chart, or rendered any opinions to Orme or Christina and Cora; the only conduct occurring on the afternoon of December 12 was Dr. Mansfield looking at Christina in preparation for a return visit.  Dr. Sternbach's declaration indicates this conduct does not even rise to the

---

[9] The Court is not suggesting, however, that experts may never change their opinions, especially given the fluid nature of discovery.

[10] Dr. Mansfield's name appears one time at Paragraph 4 in Dr. Goldman's nine paragraph declaration.  See January 18, 2006 Goldman Declaration.

[11] Again, Dr. Mansfield testified he was not told about a fever at Christina's prior presentation.

15

level of treatment.[12]  See Sternbach Declaration at ¶ 11(f) (implying no treatment by Dr. Mansfield on the afternoon of December 12 by declaring, ". . . if Dr. Mansfield never saw Christina on the evening of December 12, 2002, the only time when Dr. Mansfield could have rendered any care and treatment to Christina, then logically, no action or inaction on the part of Dr. Mansfield [breached the standard of care]."). Neither Dr. Goldman's deposition nor declaration adequately discuss Dr. Mansfield's role in Christina's treatment.

Moreover, Dr. Goldman's declaration is in terms of Christina's presentations and the history obtained from Christina/Cora. See Goldman Declaration at ¶ 4. The history given to Dr. Mansfield, however, was from Orme, and Dr. Mansfield's testimony indicates that the history was basic and that he did not review Christina's chart. The history obtained was from Orme and indicated that Christina previously had an ear infection, but that Christina's ears no longer looked infected, that there was no significant temperature, an allergic reaction to medication was suspected, and she was being treated for that allergic reaction. Further, Dr. Mansfield's testimony is that Christina's appearance was consistent with an allergic reaction. Dr. Goldman does not address how the history given to Dr. Mansfield by Orme indicates a virulent bacterial infection or something other than an allergic reaction.

Given the above considerations, the Court does not believe that the state of Dr. Goldman's opinions/testimony with respect to Dr. Mansfield are sufficient to contradict Dr.

---

[12]There is an odd conflict in the testimony between Dr. Mansfield and Cora. Dr. Mansfield testified that Christian returned during the evening of December 12, that she was seen out of order because Cora was an FCH employee, that there was no additional swelling, and there was no record generated because the purpose of the visit was only to ensure that the swelling had not worsened and Cora was an employee. See Mansfield Deposition at 31:6-33:6. On the other hand, Cora testified that she did not take Christina back to FCH that evening and that Dr. Mansfield did not re-examine her. See Cora Romar Deposition at 73:15-76:14. Christina's operative complaint also indicates only one presentation on December 12. See First Amended Complaint at ¶¶ 9-13. Irrespective of this conflict, Dr. Goldman's opinions are apparently based on the understanding that Christina went to FCH only one time on December 12, i.e. Christina did not return to FCH between 8:00 and 8:30 p.m. See Goldman Deposition a 57:1-3. In other words, Dr. Goldman's opinions do not specifically address conduct by Dr. Mansfield, if any, occurring on the evening of December 12. Since Dr. Sternbach addressed the conflict in his declaration and still opined that there was no breach of the standard of care even if Christina returned that evening, see Sternbach Declaration at ¶ 11, there is a critical absence of necessary expert testimony by Christina that addresses conduct by Dr. Mansfield, if any, on the evening of December 12. See Hutchinson, 838 F.2d at 392-93; Hanson, 76 Cal.App.4th at 607; Jambazian, 25 Cal.App.4th at 844; Willard, 121 Cal.App.3d at 412.

16

Sternbach's detailed declaration. Because Christina has not presented sufficient expert medical testimony to raise a disputed issue of material fact as to Dr. Mansfield, summary judgment is appropriate. See Hutchinson, 838 F.2d at 392-93; Hanson, 76 Cal.App.4th at 607; Jambazian, 25 Cal.App.4th at 844; Willard, 121 Cal.App.3d at 412

## CONCLUSION

In California, a medical malpractice plaintiff is generally required to produce expert medical evidence that the standard of care was breached. The failure to do so entitles a defendant physician to summary judgment. Here, Dr. Mansfield has presented a relatively detailed declaration from his expert, Dr. Sternbach. Christina relies on the deposition and pre-deposition declaration of Dr. Goldman. However, there is tension and conflict between the declaration and deposition, Dr. Goldman's deposition testimony indicated that she offered no opinions regarding Dr. Mansfield to reasonable medical probability, the declaration no longer accurately reflects the opinions of Dr. Goldman in this case, the declaration groups all three admissions together even though Dr. Mansfield saw Christina on only one admission, and neither the deposition nor the declaration adequately address Dr. Mansfield's role in the care of Christina given his deposition testimony and Dr. Sternbach's declaration. Since Dr. Goldman's testimony and opinions, as presented, do not sufficiently rebut Dr. Sternbach's declaration, no material disputed fact has been created and summary judgment is appropriate.

Accordingly, IT IS HEREBY ORDERED that Defendant Dr. Mansfield's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: **March 21, 2007**          /s/ Anthony W. Ishii
0m8i78                              UNITED STATES DISTRICT JUDGE