1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CHRISTINA ROMAR, a minor suing through her mother and legal representative, CORA ROMAR,** ) ) ) | **CIV F 03-6668 AWI SMS** |
| ) | **ORDER ON PLAINTIFF'S** |
| **Plaintiff,** ) | **MOTION FOR PARTIAL** |
| ) | **SUMMARY JUDGMENT AND** |
| **v.** ) | **THE HOSPITAL'S MOTION** |
| ) | **FOR SUMMARY JUDGMENT** |
| **FRESNO COMMUNITY HOSPITAL** ) | |
| **AND MEDICAL CENTER, and** ) | |
| **DR. THOMAS MANSFIELD,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

This case arises out of three presentations on December 10, 12 and 14, 2002, by minor Plaintiff Christina Romar ("Christina") to the emergency department of Defendant Fresno Community Hospital ("FCH"). Initially Christina was diagnosed with an ear infection, but later developed swelling around her eyes. On December 12 and 14, Christina was diagnosed as having an allergic reaction. On December 17, 2002, Christina presented to Children's Hospital, where it was determined that she had a virulent bacterial infection. Christina's course at Children's Hospital was lengthy and difficult because the infections spread. Christina was eventually discharged but suffered permanent injury due to the bacterial processes. On November 24, 2003, Christina, through her mother Cora Romar ("Cora"), brought suit against FCH and Dr. Mansfield for violations of 42 U.S.C. § 1395dd (the Emergency Medical Treatment

1  and Active Labor Act ("EMTALA")), and California law medical malpractice.  Dr. Mansfield

2  has been granted summary judgment and is no longer a party to this suit.  Both Christina and

3  FCH move for summary judgment.  For the reasons that follow, the motions will be denied.

4

5  **FACTUAL BACKGROUND**

6  On December10, 2002, Christina was brought to FCH by her daycare provider.  See Cora

7  Deposition at 42:24-43:13.  Christina's mother, Cora, worked for FCH in the cafeteria.  See id. at

8  8:9-9:1.  Christina was taken to the ER because she had a fever.  See id. at 40:3-7.  From the

9  medical records, Christina had  "cold symptoms" for several days, which appears to be

10  cough/congestion, fussiness, runny nose, and pulling at her ears.  See Plaintiff's Exhibit 1.

11  Christina had a fever of 103, blood pressure of 134/94, a pulse of 108, respiration of 26, and

12  weight of 15 kg.  See id.; PRDUMF No. 7.[1]  It was noted that Christina had tympanic membrane

13  erythema and loss of tympanic membrane landmarks.  See Plaintiff's Exhibit 1.  Christina was

14  diagnosed with an ear infection (otitis media) and fever, given Amoxicillin , Tylenol, and

15  Pediacare, and discharged home.  See Plaintiff's Exhibit 1; DUMF No. 7;[2] PRDUMF No. 7.

16  Christina returned to the ER on the morning of December 12, 2002, with a chief

17  complaint of peri-orbital bilateral swelling (swelling around both eyes) that had onset that day.

18  See Plaintiff's Exhibit 2.  It was noted that Christina had a recent ear infection and had been to

19  the emergency room two days prior.  See id.  However, there does not appear to be an indication

20  of ear pulling, tympanic erythema, or continued loss of tympanic membrane landmarks.  See id.

21  The records indicate a temperature of 99.5, weight of 15 kg, respiration of 26, and possible sore

22  throat.[3]  See id.  Christina was diagnosed as having a likely allergic reaction to Amoxicillin, was

23  _____

24  [1]"PRDUMF" is "Plaintiff's Response to Defendant's Undisputed Material Facts."

25  [2]"DUMF" is "Defendant's Undisputed Material Facts."

26  [3]Christina states that a sore throat was noted for this admission.  From the Court's review of the medical
   records, at bates #000016 next to sore throat, there is the notation "+/-."  The same notation is found next to "fever"
27  on the same page.  Since 99.5 is less than a full degree fever, the Court takes the notation to mean "more or less."

28  2

1  given decadron and Benadryl, told to stop the Amoxicillin, and to return later that night.  See id.

2  Christina was apparently prescribed Benadryl and Prelone.[4]  See id. PRDUMF No. 9.

3      Christina returned to FCH during the evening of December 14, 2002, again with a chief

4  complaint of eye swelling, but this time the swelling had moved over into her forehead.  See

5  Plaintiff's Exhibit 3; DUMF No. 9; PRDUMF No. 9.  Christina's temperature appears to have

6  been around 98 degrees (records unclear),[5] her blood pressure was 124/94, her pulse was 132, her

7  respiration was 20, and she now weighed 16.5 kg.  See Plaintiff's Exhibit 3.  It was also noted

8  that Christina had been lethargic, her eyes had a crusty discharge, that she had been to FCH on

9  December 10 and was given Amoxicillin, and had returned on December 12 and was given

10  Benadryl and told to stop the Amoxicillin.[6]  See id.  Christina was again assessed as having an

11  allergic reaction to Amoxicillin.  See id.  Christina was told to continue taking Benadryl and

12  Prelone, return if her condition worsened, and to follow up with her primary physician.  See id.

13      FCH's records for Christina's admissions on December 10, 12, and 14 show that on none

14  of these presentations did Christina receive a complete blood count ("CBC"), a blood

15  differential, blood cultures, urine cultures, a CT scan, a sedimentation rate, or intravenous

16  antibiotics.  See PUMF No. 1.  Also, at each of these three presentations, Cora signed a

17  "Conditions of Admission or Service" form (hereinafter "Conditions Form").  See Gonzalez

18  Declaration Exhibit A.  The Conditions Form is two pages,[7] largely single spaced in

19  approximately 8 point font, and has large signature spaces on the bottom of both pages that take

20  up roughly one third of the page.  See id.  The third paragraph (out of seven) on the first page of

21

22      [4]Not all of entries in the medical records are legible or decipherable to the Court.

23      [5]The records also appear to indicate that Christina had been taking Tylenol.  See Plaintiff's Exhibit 3.

24      [6]Christina indicates that the records show ear pain on December 14, 2002.  See PRDUMF No. 9.  However,
25  the only notation of ear pain that the Court has found is at bates 000005 under the "Past History" section.  See
    Plaintiffs Exhibit 3.

26      [7]The second page of the Conditions Form is very similar to the first page, has five paragraphs, four of which
27  deal with insurance and financial matters and the fifth deals with consent to contact a patient's employer.  See
    Gonzalez Declaration Exhibit A.

28                                3

the Conditions Form reads:

**Legal Relationship Between Hospital and Physician:**  All physicians and surgeons furnishing services to the patient, including the radiologist, pathologist, anesthesiologist and the like are independent contractors with the patient and are not employees or agents of the hospital.  The patient is under the care and supervision of his/her attending physician and it is the responsibility of the hospital and its nursing staff to carry out the instructions of such physician.  It is the responsibility of the patient's physician or surgeon to obtain the patient's informed consent, when required, for medical or surgical treatment, special diagnostic or therapeutic procedures, or hospital services rendered the patient under the general and special instructions of the physicians.

Id. (bold type and underlining in original).  The Conditions Form's signature block on both pages reads in part that, "The undersigned certifies that he/she has read the foregoing, received a copy thereof, and is . . . the patient's legal representative . . . ."  Id.

On December 17, 2002, Christina was initially taken to Pediatrics Plus, and was later taken to Children's Hospital in Madera.  See Cora Deposition at 99:1-18, 101:9-25.  Christina initially appeared non-toxic, but did have a fever of 105 degrees and diarrhea.  See Martin Declaration at ¶ 12; Weiss Declaration at ¶ 15.  However, a CT scan and blood work later revealed a virulent bacterial infection, which eventually spread through Christina's body.[8]  See Plaintiff's Opposition at 3:8-16.  Christina spent weeks in the hospital undergoing various treatments, including surgeries, to combat the infectious processes afflicting her.  See id. Christina eventually recovered and was discharged, but has suffered permanent injury because of the infection and related treatment and complications.  See id.

During discovery, Christina requested that FCH produce "the emergency room records of all patients treated for a fever, possible infection, or other condition you deem similar to plaintiff's in December 2002."  See PUMF No. 2; Plaintiff's Exhibit 5.  In response, FCH objected that the terms "fever," "possible infection," and "other condition you deem similar to plaintiff's in December 2002" were vague and ambiguous.  See Plaintiff's Exhibit 5.  FCH made several other objections to the request for production.  See id.  However, FCH did respond, but

---

[8]There is a disputed regarding the results of the blood work done by Children's Hospital on December 17, 2002.  Cf. DUMF No. 10 with PRDUMF No. 10.

without waiving objections, that it would "search for patients seen in the emergency department within the 12 months prior to Christina Romar's subject visits who were demonstrating the same composite of symptoms as [Christina] on her separate visits to that emergency department in December 2002 upon receipt of the required assurances, etc.; records regarding emergency department visits for patients with the same composite of symptoms will then be de-identified as required by law and produced." Id.; see also PUMF No. 3.  A motion to compel the disclosure of patient records was filed by Christina on June 14, 2005, with Magistrate Judge Snyder.  See Court's Docket Doc. No. 42.  FCH filed an opposition to the motion, see id. at No. 45, and a hearing was held on July 14, 2005.  See id. at No. 49.  Magistrate Judge Snyder granted in part and denied in part Christina's motion to compel.  See id. at No. 56.

As part of her ruling, Magistrate Judge Snyder specifically found, "In anticipation of Plaintiff's motion and this order, [FCH] has already performed extensive work identifying, pulling, reviewing, redacting, and copying *potentially relevant*, third-party patient, emergency visit records for patients aged 22 months old to one [73 months] at the time of their visits between December 1, 2001, to December 31, 2002."  Court's Docket Doc No. 56 at p.2 ¶ 8 (emphasis added).  Magistrate Judge Snyder limited the records that FCH was required to produce to patients aged 22 months to 73 months of age.  See id. at pp. 2-3 ¶ 2.  Magistrate Judge Snyder then in part held:

> As [FCH] has already spent hundreds of man-hours and thousands of dollars to identify *potentially relevant* emergency visits, the production of third-party patient records under this order will be limited to the emergency visit records that [FCH] has already identified in anticipation of this order;
> . . . . . . .
>
> As to the emergency visit records not included above, Plaintiff's motion to compel is denied without prejudice.  If after review of the records ordered to be produced herein should Plaintiff's experts . . . believe that additional third-party, toddler records are needed, Plaintiff shall prepare a new noticed motion supported by a declaration from her experts regarding what specific records in addition to the records previously produced are necessary to his/her analysis of this action and why they are necessary.  Further, all parties will be required to brief the issues of the meaning of "similarly symptomed" under an EMTALA disparate screening analysis and who should bear an additional production costs.

5

1  Id. at p. 3 ¶¶ 3, 6 (emphasis added).

2  FCH produced 287 patient records (hereinafter "the 287 records") in compliance with

3  Magistrate Judge Snyder's order.  See DRPUMF No. 5.  Of the 287 records, Christina has

4  specially identified the records of 30 third party patients (hereinafter "the 30 records").  Christina

5  contends that these patients are similarly symptomed to herself, yet they received superior

6  screenings.

7  *Declaration of Dr. Eric Weiss*

8  Dr. Weiss is FCH's emergency medicine expert.  In support of FCH's motion for

9  summary judgment, Dr. Weiss declares:

> 10    9.    Christina Romar was seen at FCH's emergency department on December
> 10, December 12, and December 14, 2002.  On each of these occasions she was
> 11    seen promptly by nurses and practitioners, received appropriate nursing
> assessments, received appropriate screening examinations which found acute
> 12    symptoms, was diagnosed, and received treatment. . . .  Nothing regarding the
> subject emergency department visits indicates a violation of EMTALA's
> 13    screening requirement.

> 14    10.    Documentation in her medical records reveals that Christina Romar did
> not have an emergency medical condition while at FCH in December 2002.
> 15    Based upon the symptoms Christina presented and the impressions and findings of
> the practitioners, there was no role for diagnostic studies as part of her screening
> 16    or a need for treatment different than that which was rendered.  No diagnostic
> studies were needed on December 10, December 12, or December 14 to comply
> 17    with EMTALA's screening requirement.

> 18    11.    Christina Romar was examined, diagnosed, and treated on each of her
> December 2002 visits to FCH's emergency department.  There was no breach of
> 19    the standard of care on any of the visits.[9]
> . . . . . . . . .

> 20
> 21    17.    In addition, to the above, Christina Romar was screened no different than
> other similar patients who were perceived to have the symptoms that Christina
> displayed on anyone of her December 2002 FCH emergency department visits.

> 22
> 23    18.    I received hundreds of medical records pertaining to other patients seen at
> FCH's emergency department.  I am informed and believe that these 287 third-
> 24    party patient visit records were produced pursuant to an order issued by
> Magistrate Snyder in this action.  Further, my understanding is that these records

25  _____

26    [9]Dr. Weiss also specifically opined that none of the nurses or employees of FCH or any of the
practitioners's treatment of Christina breached the standard of care and nothing that any medical professional did
27  caused any harm to Christina.  See Weiss Declaration at ¶¶ 12-14.

28                                          6

were redacted in accordance with HIPAA requirements, but are all of patients aged 22 months-old to one month after their sixth birthdays at the time of their emergency department visits between December 1, 2001 and December 31, 2002. As the various stages of development can lead to different screening and treatment concerns, patients in the toddler stage of development are the relevant population when comparing them to Christina Romar in December 2002.

19.    I have reviewed the third-party patient visit records and have found no support for a claim of disparate screening.  None of the hundreds of visits reveal a similarly symptomed patient who was screened differently than Christina Romar. The medical screening examinations received by Christina Romar and other similarly symptomed patients were fully compliant with the requirements of EMTALA.  There was no EMTALA screening violation.

Weiss Declaration at ¶¶ 9-11, 17-19.

*Declaration and Deposition of Dr. Peggy Goldman Dated August 9, 2006*

Dr. Goldman is Christina's emergency medicine and infectious diseases expert.  In support of summary judgment, Dr. Goldman submitted a declaration which states in part:

3.    I have reviewed and considered the records of plaintiff's three emergency admissions [at FCH] between December 10 and December 14, 2002.  I have also reviewed and considered the records provided by [FCH] as to the emergency department that they deem similarly situated to plaintiff.

4.    Based upon my review and consideration of these case materials in this action, it is my opinion that the screening examinations plaintiff received at [FCH] on December 10, 12, and 14, 2002, were inappropriate and therefore not in compliance with [EMTALA].  Specifically, the above referenced records show that numerous similarly situated patients received screening examinations that were, in crucial respects, more extensive and superior to those received by the plaintiff upon her three emergency admissions.

5.    Indeed, all of the thirty similarly situated patients whose treatment is reflected in the table that also accompanies this declaration received one or more of the screening measures that I identified in my declaration and report as required as to plaintiff: a CBC, blood differential, blood and urine cultures, a CT scan, sedimentation rate, and/or intravenous antibiotics.  Therefore, it is apparent that plaintiff did not receive the screening examination to which she was entitled under EMTALA, i.e. the same screening examination that any and all other similarly situated patients would have received.

Goldman Declaration at ¶¶ 3-5.

Attached as part of Dr. Goldman's declaration is a summary of the 30 records of patients who received additional tests as part of their emergency department presentation at FCH.  See Plaintiff's Exhibit 6, Attachment No. 3.  This attachment was prepared by Christina's counsel

7

includes a patient's chief complaints and the clinical impression.

In her deposition, Dr. Goldman testified in part:

There can never be an identical match because patients are different, so close enough to warrant the same approach by a physician, I guess would be the criteria that we could use, and there are some.  Basically, fever is the essential portion.  That's the essential feature that is of greatest concern to an emergency physician when seeing a child.

The other symptoms can be variable depending on how important a part of the primary problem they are.  So, for example, with febrile illnesses, what you're concerned about is making a diagnosis of an infection and emesis can be a variable presentation of an infection.  So can fever, but in general fever is more consistently present than emesis when there's been an infection present.

So if we use a functional definition, which is when you are concerned in a child that a serious infection can be present or an emergency medical condition such as an infection can be present, I would be looking for fever, vomiting, respiratory symptoms, pulling at the ears, cold cough, diarrhea, pain any where in the body.  Any of these areas I think would fall into the functional definition of trying to separate out a child who has an emergency medical condition who has an infection.
. . . . .

There is no one on this list that is exactly the same as Christina because the way that Christina presented was with serious bilateral swelling around her eyes in the setting of having had a fever two days before and otitis media.  So in that clinical context, orbital cellulitis which can be a life-threatening medical emergency needs to be ruled out and there's no patient on this list that's exactly like her.

However, the patients on this list are similar to her in the sense that they are all patients who could have an emergency medical condition that is an infection.  And in that sense, what the doctor – what the emergency medicine doctor is trying to do is to separate out those patients with an emergency medical condition due to an infection from those who don't, and also trying to determine how serious that condition can be.

So in terms of using that definition as similar in terms of presentation which is taking the essence of what the doctor is trying to do with the visit, all of these patients are similar, although not exactly like her, and they have additional tests performed to rule out an emergency medical condition that is life-threatening or serious . . . And those things would include chest x-rays, IV antibiotics, blood counts, unspecified labs and other interventions.

Goldman Deposition at pp. 34-35, 60-61.  Dr. Goldman also indicated that she did not review each of the individual 287 patient records produced by FCH, but did review 3 of the 30 patient records in detail, and "flipped through" the remaining 27.  See id. at 21:22-22:9, 27:12-25, 72:14-73:11.  Also, Dr. Goldman testified that no malpractice occurred on December 10, 2002.  See id.

1   at 31:20-32:6.

2   **SUMMARY JUDGMENT STANDARD**

3         Summary judgment is appropriate when it is demonstrated that there exists no genuine

4   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

5   Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

6   American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

7   F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

8   undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

9   Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

10   case turns on a mixed question of law and fact and the only dispute relates to the legal

11   significance of the undisputed facts, the controversy for trial collapses into a question of law that

12   is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

13   1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

14         Under summary judgment practice, the moving party always bears the initial
      responsibility of informing the district court of the basis for its motion, and

15         identifying those portions of "the pleadings, depositions, answers to
      interrogatories, and admissions on file, together with the affidavits, if any," which

16         it believes demonstrate the absence of a genuine issue of material fact.

17   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

18   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

19   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

20   file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

21   upon motion, against a party who fails to make a showing sufficient to establish the existence of

22   an element essential to that party's case, and on which that party will bear the burden of proof at

23   trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

24   nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

25   circumstance, summary judgment should be granted, "so long as whatever is before the district

26   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

27

28   9

1   satisfied." Id. at 323.

2        If a moving party fails to carry its burden of production, then "the non-moving party has

3   no obligation to produce anything, even if the non-moving party would have the ultimate burden

4   of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

5   Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing

6   party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec.

7   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d

8   at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles,

9   607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the

10  suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

11  Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.

12  2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

13  could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil,

14  322 F.3d at 1046.

15       In attempting to establish the existence of a factual dispute, the opposing party may not

16  rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

17  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

18  contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

19  391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However,

20  the opposing party need not establish a material issue of fact conclusively in its favor.  It is

21  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

22  parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City

23  of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to

24  'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

25  trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 650 F.2d 129, 132 (9th

26  Cir. 1982).

27

28                                               10

1    In resolving a summary judgment motion, the court examines the pleadings, depositions,

2  answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Rule

3  56(c); Fortyune, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances

4  to consider materials that are not properly brought to its attention, but the court is not required to

5  examine the entire file for evidence establishing a genuine issue of material fact where the

6  evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas

7  Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified

8  Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be

9  believed, and all reasonable inferences that may be drawn from the facts placed before the court

10  must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475

11  U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless,

12  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

13  factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328

14  F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d

15  993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply

16  because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del

17  Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Bryant v. Adventist

18  Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

19    Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

20  show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

21  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party

23  fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

24  entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

25

26

27

28                                                      11

# CHRISTINA'S EMTALA CLAIM

*Plaintiff's Arguments*

Christina argues that she is entitled to summary judgment on the issue of liability on her EMTALA claim because the record shows that 30 other similarly symptomed patients received superior screenings to Christina. Dr. Goldman's declaration confirms that these 30 patients received additional tests and thus, received superior screenings in comparison to Christina. Importantly, FCH itself selected and produced the 287 patient records from which the subset of 30 patients was taken. In producing these documents, FCH has admitted their authenticity and responsiveness to Christina's request. See Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996); Snyder v. Whittaker Corp., 839 F.2d 1085, 1089 (5th Cir. 1988). Given Dr. Goldman's opinions and FCH's own production of these records, there is no doubt that Christina received disparate screening, and summary judgment in her favor on liability is warranted.

With respect to FCH's motion, that motion is based on a faulty assumption. That is, FCH incorrectly believes that Christina must provide evidence that patients with symptoms identical to her own were screened materially different than she was. However, it is not required that patients with identical symptoms be found, instead evidence must be presented that at least one patient with a similar presentation was not screened identically. There are 30 other patients with similar presentations who received medical screening exams superior to Christina in that they received tests that would have helped to identify Christina's virulent bacterial infection. Dr. Goldman testified that the 30 records revealed conditions that, while not identical to Christina's, were similar in that they all exhibited symptoms that indicated a possible bacterial infection and they all received additional tests that would likely have detected bacterial infections. Summary judgment in favor of FCH must be denied.

*Defendant's Arguments*

FCH argues that it produced records that are "potentially relevant." It did not produce

1  records of patients that it deemed was "similarly symptomed" or similarly situated.  Further, FCH

2  does not dispute the authenticity of the records.  However, admitting authenticity of the records is

3  not the same as admitting that the records are all of patients who are similarly symptomed.  FCH

4  has never deemed the 287 or the 30 identified by Christina as being similarly symptomed to

5  Christina.  Further, of the 30 patients identified by Christina, the only patients who received

6  blood tests, urinalysis, x-ray or other screening procedures had symptoms in addition to

7  Christina's, including vomiting, diarrhea, wheezing, and rales.  Further, Christina and her

8  counsel represented to FCH and the Court that not one of the 287 records produced by FCH

9  reflected a patient with Christina's symptoms who received a materially different screening.  Dr.

10  Goldman has also admitted that there is not a patient with Christina's exact symptoms.  Finally,

11  the summary of the 30 patient records was prepared by Christina's counsel, and the summary is

12  inaccurate in that it contains omissions and misrepresents.

13        With respect to its own motion for summary judgment, FCH argues that there is no

14  evidence of disparate screening.  A disparate screening requires that patients presenting with the

15  same symptoms were actually screened differently than plaintiff.  There is no evidence that any

16  patient presented with the same symptoms as plaintiff, and even Dr. Goldman so admitted and

17  acknowledged that plaintiff's presentation was unusual.  Since there is no evidence of a patient

18  who presented with "symptoms identical to plaintiff," summary judgment on the EMTALA

19  claim is appropriate.

20        *Legal Standard*

21        EMTALA is also known as the "Patient Anti-Dumping Act" and reflects the concern that

22  "hospitals were dumping patients who could not pay for care, either by refusing to provide

23  emergency treatment to these patients or by transferring [them] to other hospitals before [their]

24  conditions stabilized."  Jackson v. East Bay Hospital, 246 F.3d 1248, 1254 (9th Cir. 2001).

25  Under EMTALA:

26      [I]f any individual . . . comes to the emergency department [of a hospital that
    participates in the Medicare program] and a request is made on the individual's

27

28                13

behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a); see also Bryant v. Adventist Health System/West, 289 F.3d 1162, 1165 (9th Cir. 2002).  An "emergency medical condition" is a condition "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -- (I) the placing of the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ."  42 U.S.C. § 1395dd(1)(A); Jackson, 246 F.3d at 1254.

"EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him."  Baker v. Adventist Health, Inc., 260 F.3d 987, 992 (9th Cir. 2001); see 42 U.S.C. § 1395dd(a), (b).  A hospital meets its obligation to provide an "appropriate medical screening" under EMTALA when it:

provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.

Baker, 260 F.3d at 995; Jackson, 246 F.3d at 1256; Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258-59 (9th Cir. 1995); see also Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995).  "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."  Correa, 69 F.3d at 1192.  EMTALA does not require hospitals to provide identical screening to patients presenting with different symptoms and does not require hospitals to provide screenings that are beyond their capabilities.  Baker, 260 F.3d at 995; Hoffman v. Tonnemacher, 425 F.Supp.2d 1120, 1130 (E.D. Cal. 2006).

Conversely, a failure to provide any screening, the provision of a "cursory screening" that amounts to no screening at all in that it is not designed to detect acute and severe symptoms, and

14

disparate treatment such as the hospital's failure to follow its own screening procedures, may all constitute a breach of the hospital's duty to provide an appropriate medical screening to a patient seeking emergency treatment.  See 42 U.S.C. § 1395dd(a); Bryant, 289 F.3d at 1166; Baker, 260 F.3d at 994-95; Jackson, 246 F.3d at 1256; Correa, 69 F.3d at 1192-93; Eberhardt, 62 F.3d at 1258-59.

To recover for disparate treatment, the plaintiff must proffer evidence "sufficient to support a finding that she received materially different screening than that provided to others in her condition.  It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position." Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000).  "It is the plaintiff's burden to show that the hospital treated her differently from other patients; a hospital is not required to show that it had a uniform screening procedure." Marshall v. East Carroll Parish Hosp. Serv., 134 F.3d 319, 323-24 (5th Cir. 1998).  However, a de minimus deviation from a hospital's standard screening policy is insufficient to establish a violation of EMTALA.  Repp v. Anadarko Municipal Hospital, 43 F.3d 519, 523 (10th Cir. 1994); see also Vargas by & through Gallardo v. Del Puerto Hosp., 98 F.3d 1202, 1205 (9th Cir. 1996).  Further, where a claim of inappropriate screening is based on a "failure to provide certain diagnostic tests," a plaintiff "must at least address whether the hospital was capable of performing such tests." Agosto, 299 F.3d at 22.  However, negligence in the screening process or the provision of a merely faulty screening, as opposed to refusing to screen or disparate screening, does not violate EMTALA, although it may implicate state malpractice law.  See Agosto, 299 F.3d at 21; Marshall, 134 F.3d at 323-24; Correa, 69 F.3d at 1192-93; see also Jackson, 246 F.3d at 1255-56.

*Discussion*

With respect to Christina's contention that FCH has deemed the 287 patient records, and in particular the 30 records, to be similarly symptomed to Christina, the Court cannot agree. Christina's requests for production included one request that in part requested the redacted

1    records of any patients FCH deemed to have similar symptoms to Christina.  However,

2    objections were made to that request and a motion to compel had to be filed and heard.  The

3    resolution of the motion to compel, and thus the request for production, required FCH to produce

4    records that it had already identified as "potentially relevant."  <u>See</u> Court's Docket Doc. No. 56 at

5    p. 3, ¶ 3.  Thus, when FCH complied with the order on the motion to compel, and therefore the

6    request for production, it produced 287 "potentially relevant" records.  "Potentially relevant" is

7    not the same as "similarly symptomed."  Moreover, the order on the motion to compel itself does

8    not contemplate settling the issue of similarly symptomed.  The last sentence of the last

9    paragraph states that the parties "will be required to brief the issues of the meaning of 'similarly

10   symptomed' under an EMTALA disparate screening analysis . . . ."  <u>Id.</u> at p.3, ¶ 6.  The issue of

11   "similarly symptomed" required further briefing and obviously had not been resolved by the

12   motion to compel, which was the mechanism for Christina obtaining the 287 records.  Thus, the

13   287 records produced by FCH are "potentially relevant" only, and by their production, FCH has

14   not admitted that these patients are all "similarly symptomed" to Christina.[10]

15        Production of the 287 records aside, there is a disagreement between the parties regarding

16   what constitutes "similarly situated" or "similarly symptomed" patients.  From the moving and

17   opposition papers, FCH's position is that "identical symptoms" are required.  The Court does not

18   agree with this view of EMTALA.  The Ninth Circuit requires a plaintiff to receive "an

19   examination comparable to the one offered to other patients presenting *similar symptoms*."

20   <u>Baker</u>, 260 F.3d at 995 (emphasis added); <u>Jackson</u>, 246 F.3d at 1256.  "Similar" means "having

21   characteristics in common . . . alike in substance or essentials,"[11] it is not the same as "identical."

22

23

24        [10]The Court agrees that documents produced by a party in discovery are deemed authentic when offered by
     the party-opponent.  <u>See</u> Orr v. Bank of Am., 285 F.3d 764, 777 n.20 (9th Cir. 2002); <u>Maljack Prods.</u>, 81 F.3d at 889
     n.12; <u>Snyder</u>, 839 F.2d at 1089.  "Authentication is a condition precedent to admissibility, and this condition is
25   satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  <u>Orr</u>,
     285 F.3d at 773 (quoting Fed. R. Evid. 901).  Authentication is not at issue since FCH admits that the 287 patient
26   records are medical records, in addition to having produced the records now offered by Christina.

27        [11]Definition of "similar" taken from Merriam Webster On Line Dictionary (www.m-w.com).

28                                              16

Thus, to show a disparate screening, Christina is not required to identify patients who are identically symptomed to her, rather, she need only identify patients with "similar symptoms."

Since "similar" is not the same as "identical," similarly symptomed or similarly situated patients will not necessarily have identical symptoms. The question then becomes how similar to Christina do other patients need to be in order to be considered "similarly symptomed" or "similarly situated." Both parties have cited *Hoffman v. Tonnemacher*. In *Hoffman*, the plaintiff alleged *inter alia* that she had received a disparate screening. See Hoffman, 425 F.Supp.2d at 1135-37. To show disparate screening, Hoffman relied on the deposition testimony of Dr. Tonnemacher. See id. Dr. Tonnemacher had indicated that, in the last 3 years, he had ordered blood cultures on approximately six non-elderly patients whom he suspected as having a bacterial infection (Hoffman had a bacterial infection). See id. at 1136-37. However, Dr. Tonnemacher testified that the six patients had open sores, cellulitis, erythema, and/or possibly a methecillin resistant bacteria, that Hoffman had none of these conditions, and that there was nothing about Hoffman's presentation that indicated a need for blood tests. See id. This court recognized that EMTALA does not require differently symptomed patients to receive the same screening, and then held that, since "Hoffman did not have the same 'dispositive' symptoms as the six other patients, as explained by Dr. Tonnemacher, EMTALA did not mandate that Hoffman receive the same treatment/screening as the other six." Id. at 1137. The six patients had different key symptoms and thus, were not in a similar condition as Hoffman, see Jackson, 246 F.3d at 1256; Reynolds, 218 F.3d at 84, that is, there was no showing that Hoffman was similarly situated to Dr. Tonnemacher's other six patients. See Hoffman, 425 F.Supp.2d at 1143.

The evidence in this case is different from the evidence presented in *Hoffman*. The only testimony in *Hoffman* about the allegedly similarly symptomed six patients was uncontradicted testimony from Dr. Tonnemacher himself. See id. at 1135-37. Dr. Tonnemacher testified that there were additional symptoms that the six patients had, but that Hoffman did not, and that it was the presence of those particular or peculiar symptoms that made the six patients materially different from Hoffman. The six patients had key or dispositive symptoms that were different

17

1  from Hoffman, and those symptoms caused the additional diagnostic tests to be utilized.  See id.

2  at 1136-37.  In this case, by contrast, there is contradictory medical testimony.  Dr. Weiss has

3  reviewed all of the 287 records and is of the opinion that none reflect a patient who was similarly

4  symptomed to Christina and who received a better screening than Christina.  See Weiss

5  Declaration at ¶ 19.  Dr. Goldman, on the other hand, is of the opinion that the 30 records reveal

6  similarly symptomed patients who received superior screenings compared to Christina.  See

7  Goldman Declaration at ¶ 5; Goldman Deposition at pp. 29-35, 60-61.[12]  Dr. Goldman's opinion

8  is based on classifying Christina and the 30 records as reflecting patients who possibly had

9  bacterial infections.  Dr. Goldman's key symptom for Christina appears to be fever with other

10  cold symptoms, including a prior diagnosed otitis media.  See Goldman Deposition at pp. 34-35,

11  60-61.  At oral argument, Christina characterized Dr. Goldman as identifying fever and cold

12  symptoms as the key or dispositive symptoms.  The periorbital swelling was identified as

13  Christina's chief complaints in the medical records for December 12 and 14, and, from a lay

14  perspective, would appear to be the key symptom, but Dr. Goldman's expert medical testimony

15  suggests that the periorbital swelling is not the key or dispositive symptom.  Although it does not

16  appear that all 30 records actually reflect Dr. Goldman's understanding of a similarly symptomed

17  patient, e.g. Record 111 (patient had an insect bite that apparently caused eye swelling and had

18  no fever), some records do fit her opinion.  E.g. Records 24, 205.  Nevertheless, there is a

19  conflict of opinions between Dr. Goldman and Dr. Weiss.  A jury will determine what weight

20  and credibility to give to Dr. Goldman's and Dr. Weiss's respective opinions, and will resolve

21

22

23  _____

24  [12]Dr. Goldman's declaration and deposition are somewhat ambiguous as to whether she reached her own
independent conclusion that the 30 records are similarly situated to Christina, or whether she simply relied on the

25  fact that FCH produced records and believed that FCH itself decided who was similarly symptomed.  See Goldman
Declaration at ¶ 2; Goldman Deposition at pp. 29-35.  At oral argument, the Court requested clarification from

26  Christina's counsel.  Christina's counsel replied that Dr. Goldman was not relying only on the fact that FCH
produced the records.  Resolving the ambiguities in Christina's favor, and given Christina's counsel's

27  representations, the Court assumes that Dr. Goldman has concluded, and concluded not solely on the basis that FCH
produced the 287 records, that the 30 records are patients who are similarly symptomed to Christina.

28                                                          18

what symptoms are key, whether the 30 records are sufficiently similar,[13] and whether Christina

was disparately screened.[14]   Both Christina and FCH's motions for summary judgment on

Christina's EMTALA claim are denied.


**CHRISTINA'S MEDICAL MALPRACTICE CLAIM**

*Defendant's Argument*

FCH's nursing care expert, Nurse Bernadette Martin, has opined that none of FCH's

nursing staff breached the standard of care.  Neither plaintiff nor Dr. Goldman have identified

specific employees who were negligent.  Dr. Goldman's criticisms relate to the medical

---

[13]FCH has objected to Attachment 3 of Plaintiff's Exhibit 6 ("Attachment 3"), which is a summary of the 30 records.  The summary consists of a record number, priority status, chief complaint, clinical impression, and ancillary services utilized.  FCH essentially objects that the summary was prepared by Christina's counsel and is inaccurate and incomplete.  Christina has submitted the actual records of all 30 patients.  The information contained in Attachment 3 generally appears to be accurate, although there are exceptions.  E.g. Record 87 (summary states that patient 87 had fever, but actual record shows that fever was denied and the recorded temperature was less than 98.6).  Attachment 3 lists chief complaints, which corresponds to a specific section of a particular form within the medical records.  FCH's objections that not all symptoms are identified also appears to be correct, but the additional symptoms identified by FCH generally are found in other parts of the medical records.  Thus, the information that is summarized in Attachment 3 is generally accurate for what it contains, but is not necessarily complete in terms of identifying all symptoms found within the medical records.  Since most of the information actually contained in Attachment 3 appears to be correct, and many of the actual records themselves, apart from the summaries embodied in Attachment 3, appear to fall within Dr. Goldman's opinions, Attachment 3 in and of itself will not change the result of this motion.  Accordingly, for purposes of this motion, FCH's objections are overruled.

However, to the extent that Dr. Goldman relies on Attachment 3, any inaccuracies or incompleteness will likely affect the weight and not the admissibility of Dr. Goldman's opinions and are a proper subject for cross examination.  See Bergen v. F/V St. Patrick, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (noting that weaknesses in the underpinnings of an expert's conclusion go to the weight of the evidence and may be explored during cross examination).  Further, there is a dispute whether some of the 30 patients received lab work or lab orders.  This dispute will have to be clarified through competent testimony explaining the records and the entries made.

[14]FCH relies on the *Vickers* case to argue that, for EMTALA, the proper comparison group is between a plaintiff and patients who are perceived to have the same condition; not between patients who have what the plaintiff eventually turns out to actually have.  See Vickers v. Nash General Hosp., Inc., 78 F.3d 139, 144-45 (4th Cir. 1995).  The test adopted by the Ninth Circuit uses the term "symptoms" rather than the term "condition."  See Baker, 260 F.3d at 995; Jackson, 246 F.3d at 1256.  The term "condition" can be used in reference to symptoms, but "condition" can also be used in reference to a diagnosis.  As the Court understands the Ninth Circuit cases, disparate screening claims are evaluated either by comparing a plaintiff to a hospital's express guidelines or by comparing a plaintiff to what amounts to a hospital's "*de facto*" guidelines, which are in turn found by comparing the screenings received by patients who had similar symptoms to the plaintiff.  When a plaintiff's symptoms are sufficiently similar to other patients, the plaintiff and the other patients may be said to be in a similar condition.  Cf. Jackson, 246 F.3d at 1256; Reynolds, 218 F.3d at 84. In the absence of further clarification by the Ninth Circuit, the test for disparate screening is based on patients with similar symptoms, not similar diagnoses.  See Baker, 260 F.3d at 995; Jackson, 246 F.3d at 1256.

practitioners who screened, diagnosed, and treated plaintiff on December 12 and 14; she does not

criticize the nurses or other hospital employees.  Although the complaint does not allege agency,

it is anticipated that plaintiff may rely on some form of agency theory.  Because California

prohibits the corporate practice of medicine, FCH does not employee anyone to practice

medicine, including nurse practitioners, physician assistants, and physicians.  Further, through a

conditions of admission and services form, FCH informs patients that FCH only provides general

nursing care and does not employ or exist in any agency relationship with the medical

practitioners.  Cora received and signed this form on each of the three admissions to FCH.

Finally, even if FCH is liable for the alleged breaches, there is insufficient evidence that

the breaches, to a medical probability, caused harm to plaintiff.  Nurse Martin opines that nothing

that the nursing staff did caused injury, and Dr. Weiss opines that, even if some of the tests had

been performed, those tests would not have revealed the infection or caused plaintiff to be treated

differently.

*Plaintiff's Opposition*

Dr. Goldman identified conduct on December 12 and 14 that breached the applicable

standard of care, specifically that the standard of care required Christina to receive various

ancillary laboratory tests, the administration of intravenous antibiotics, a consultation with a

specialist, and a replacement antibiotic for the Amoxicillin.  See Goldman Deposition at pp. 41-

42, 49-51, 63.

FCH is really arguing that it is not responsible for the acts of those who provided care to

Christina based on the boilerplate recitations of a form.  However, Cora has declared that she is

minimally educated, does not know what an "independent contractor" is, did not have the

documents explained to her before signing, and felt that she had to sign the documents as a

condition of the emergency treatment she thought Christina immediately required.  Cora was

likely required to sign the documents only after the care had been rendered.  Also, Cora sought

emergency care at FCH in the first instance and had no preexisting relationship with any

physician at FCH.  Under *Mejia*, there is an issue as to ostensible agency and summary judgment

20

1   is inappropriate unless the evidence conclusively shows that Christina should have known that

2   the treating physician was not an agent of the hospital.  Also, courts scrutinize and strike down

3   agreements for medical treatment that seek to relieve a hospital of liability.  See Tunkl v. Regents

4   of University of Cal., 60 Cal.2d 92 (Cal. 1963).  Finally, FCH's attack on the complaint is

5   untimely, but in any event, the complaint alleges that Christina went to FCH seeking emergency

6   care, she was in need of immediate medical attention on all occasions, that FCH was a medical

7   provider who provided Christina with emergency care, that FCH provided substandard medical

8   treatment, which under applicable law could only occur if it were responsible for the medical

9   provider's actions.  There is no requirement that agency be specially pled.

10      With respect to causation, Dr. Goldman opined that a blood differential done on

11   December 14 would more likely than not have also shown abnormalities indicative of a bacterial

12   infection, and that, but for FCH's misconduct, plaintiff had a reasonable medical probability of a

13   better outcome.  Further, Dr. Weiss is an emergency medicine physician, not an infectious

14   diseases physician; he is therefore unqualified to render causation opinions.

15   *Discussion*

16      There does not appear to be a dispute regarding FCH's nurses, that is, the nurses did not

17   commit malpractice.  See DUMF No. 16; PRDUMF No. 16.  FCH does not move for summary

18   judgment on the basis that the "medical practitioners" who treated Christina did not breach the

19   standard of care on December 12 and December 14.  Instead, the dispute centers around whether

20   FCH may be held responsible for the conduct of the "medical providers" who treated Christina

21   and whether breaches identified by Dr. Goldman caused Christina's injuries.  The term "medical

22   providers" apparently embraces physicians, physician assistants, and nurse practitioners.  See

23   FCH's Motion at p. 9:19-21; Gonzalez Declaration at ¶ 3.

24      As an initial matter, a defense of failure to state a claim upon which relief may be granted

25   may be raised as late as trial.  See Fed. R. Civ. Pro. 12(h)(2).  Because the defense can be raised

26   at trial, the Court will examine the allegations in Christina's complaint to determine whether

27   FCH had reasonable notice of an agency theory.  The active complaint alleges that Christina

28

presented to FCH three times and on each occasion she was in need of immediate medical

treatment.  See Complaint at ¶¶ 7, 9, 13, 16.  Under the medical malpractice cause of action,

Christina alleges:

> 25.   As health care providers, [FCH] and Dr. Mansfield both had a duty to engage in the non-negligent provision of medical treatment.  This duty required them to provide Christina with medical care that met or exceeded the pertinent standards of treatment.
>
> 26.   [FCH] and Dr. Mansfield breached their respective duties to provide medical treatment in a non-negligent manner.  Specifically, [FCH] breached this duty by providing substandard emergency medical treatment to Christina on December 10, 12, and 14, 2002.  Dr. Mansfield violated this duty through his actions on December 12, 2002, as alleged above.
>
> 27.   [FCH] and Dr. Mansfield's breaches of their respective duties to provide medical treatment in a non-negligent manner caused Christina's damages, as alleged herein above.
>
> 28.   Therefore, as a result of their breaching their duties to provide Christina medical treatment in a non-negligent manner, [FCH] and Dr. Mansfield are liable in this action.

Id. at ¶¶ 25-28.  Also, Christina incorporated by reference the preceding paragraphs.  In those

paragraphs, Christina alleges in some detail the care and treatment that she received from the

nurse practitioners and physician assistants on her three presentations.  See id. at ¶¶ 9, 10, 14-15.

With respect to agency and Dr. Mansfield, the Court has granted Dr. Mansfield's motion

for summary judgment on the ground that there is insufficient evidence to show that he breached

the standard of care.  Because principal/agent liability is derivative and Dr. Mansfield's conduct

did not breach the standard of care, FCH cannot be liable for Dr. Mansfield's conduct

irrespective of the complaint's allegations.  See Perez v. City of Huntington Park, 7 Cal.App.4th

817, 819-20 (1992).

With respect to the nurse practitioners and physician assistants identified in the

complaint, Dr. Goldman has testified that there were no breaches of the standard of care on

December 10.  See Goldman Deposition at 31:20-32:6.  Thus, FCH could not be liable for the

care rendered by the physician assistant on December 10.  See Perez, 7 Cal.App.4th at 819-20.

Dr. Goldman, however, has opined that the standard of care was breached on December 12 and

December 14.  Christina alleged conduct by unnamed nurse practitioners on both December 12

and December 14.  Unlike the allegations against Dr. Mansfield, Christina's complaint does not

separately account for the physician assistants and nurse practitioners under the medical

malpractice allegations.[15]  This suggests that Christina is attempting to make FCH responsible for

the nurse practitioners's conduct.  Moreover, that FCH addressed the issue of ostensible agency

in its motion for summary judgment suggests that it had notice of Christina's theory and is not

surprised by Christina's reliance on the theory.  Given the allegations in the complaint and FCH's

motion for summary judgment, FCH has received sufficiently fair notice that Christina is

attempting to make FCH responsible for the nurse practitioners's conduct, which implies an

employment or agency claim.

The issue then is what effect the notice in the Conditions Form has on Christina's

malpractice claim.  "An agency is ostensible when the principal intentionally, or by want of

ordinary care, causes a third person to believe another to be his agent who is not really employed

by him."  Cal. Civ. Code § 2300.  Generally, there are three requirements necessary before

recovery may be had against a principal for the act of an ostensible agent: (1) the person dealing

with the agent must do so with belief in the agent's authority and this belief must be a reasonable

one; (2) such belief must be generated by some act or neglect of the principal sought to be

charged; and (3) the third person in relying on the agent's apparent authority must not be guilty

of negligence.  Hill v. Citizens Nat. Trust & Sav. Bank, 9 Cal.2d. 172, 176 (1939); Seneca Ins.

Co. v. County of Orange, 117 Cal.App.4th 611, 620 (2004).  In a hospital setting, one California

court has held that "the heart" of the three usual ostensible agency requirements are two

elements:  (1) conduct by the hospital that would cause a reasonable person to believe there was

an agency relationship and (2) reliance on that apparent agency relationship by the plaintiff.  See

Mejia v. Community Hosp. of Bernardino, 99 Cal.App.4th 1448, 1457 (2002).  "Regarding the

---

[15]Since summary judgment has been granted in favor of Dr. Mansfield and FCH cannot be liable for his conduct, see Perez, 7 Cal.App.4th at 819-20, it is unnecessary to decide whether Christina's complaint gives fair notice of some form of agency claim as to Dr. Mansfield, or whether the allegations have so separated FCH and Dr. Mansfield that fair notice of an agency claim is absent.

first element, courts generally conclude that it is satisfied when the hospital 'holds itself out' to the public as a provider of care." Id. at 1454. "[A] hospital is generally deemed to have held itself out as the provider of care, unless it gave the patient contrary notice." Id. "The second element, reliance, is established when the plaintiff 'looks to' the hospital for services, rather than to an individual physician." Id. "[U]nless the patient had some reason to know of the true relationship between the hospital and the physician--i.e., because the hospital gave the patient actual notice or because the patient was treated by his or her personal physician--ostensible agency is readily inferred." Id. at 1454-55. The question of ostensible agency is generally a question for the trier of fact unless the evidence conclusively establishes that the patient knew or should have known that the treating physician was not an agent of the hospital. Id. at 1458.

Here, there is no dispute that Cora signed the Conditions Form on each of Christina's three presentations. There is further no dispute as to the content of the Conditions Form. Thus, on three separate occasions, Cora, acting on behalf of Christina, was given written notice that all "physicians and surgeons furnishing services to the patient, including the radiologist, pathologist, anesthesiologist and the like are independent contractors with the patient and are not employees or agents of the hospital." Gonzalez Declaration Exhibit A.

Cora has declared that she is a high school graduate, has never been a very good student, and has attended some college level classes. See Romar Declaration at ¶ 2. Further, Cora declared that she does not know what an independent contractor is, or why that term is important. See id. at ¶ 3. However, the notice in the Conditions Form does not simply use the term "independent contractor." Following the term "independent contractor," the notice continues that the physicians "are not employees or agents of the hospital." Gonzalez Declaration Exhibit A. Cora's declaration does not indicate that she did not read the Conditions Form, or more to the point, that she did not read that physicians are not employees or agents of FCH. Cora does declare that she did not have the Conditions Form explained to her before she signed them, but her declaration only addresses the term "independent contractor." Cora's declaration does not address the clause that the physicians "are not employees or agents of the hospital," which

24

immediately follows the term "independent contractor."  See id.  The statement that physicians

"are not employees or agents of the hospital" is a clear statement that does not require specialized

knowledge to understand and Cora's declaration does not state that she did not understand that

the physicians were not employees or agents of FCH.  Further, the Conditions Form itself

indicates that Cora read the form, which includes notice regarding the physicians's employment

and agency status.  See Gonzalez Declaration Exhibit A.  Also, whether Cora signed the

Conditions Form before or after services were rendered to Christina does not matter in this case.

As FCH points out, Cora signed the form on December 10, 12 and 14, and Dr. Goldman has

opined that there was no negligence on December 10.  Given the notice in the Conditions Form,

as of December 10, Cora knew or should have known that the physicians were not agents or

employees of FCH because FCH told her through the Conditions Form.[16]  See Mejia, 99

Cal.App.4th at 1454-55.

However, more than just physicians were involved in Christina's care.  There is no

dispute that physician assistants and nurse practitioners were involved in Christina's treatment.

FCH argues that the notice in the Conditions Form covers "medical providers."  However, the

Conditions Form states that "physicians . . . are not employees or agents of the hospital."  The

Conditions Form does not state that "medical providers" or "nurse practitioners" or "physician

assistants" are not employees or agents of the hospital.  At best there is an ambiguity whether the

Conditions Form reasonably informs patients that nurse practitioners and physician assistants are

not employees or agents of FCH.  Given the language of the notice in the Conditions Form, the

Court cannot say as a matter of law that Cora and Christina knew or should have known that the

nurse practitioners and physician assistants were not agents or employees of FCH.  Since FCH

---

[16]Christina's citation to Tunkl v. Regents of University of Cal., 60 Cal. 2d 92 (Cal. 1963), is not persuasive.
In that case, the California Supreme Court struck down a clause that read in part, "the patient or his legal
representative agrees to and hereby releases [the hospital] from any and all liability for the negligent or wrongful acts
or omissions of its employees, if the hospital has used due care in selecting its employees."  Tunkl, 60 Cal.2d at 94.
In this case, there is no such release found in the Conditions Form signed by Cora.  Cf. Gonzalez Declaration Exhibit
A.  The paragraph in the Conditions Form that is at issue merely seeks to notify patients that physicians are not
employees or agents of the hospital.  A notice of the agency status of the physicians is not the same as requiring
patients to release a hospital for the negligence of its employees.

moves for summary judgment with respect to the medical practitioners, which includes nurse practitioners and physician assistants, on the grounds that there is no ostensible agency due to the notice in the Conditions Form, summary judgment is inappropriate.

Finally, with respect to FCH's causation argument, FCH's proposed undisputed fact on this point is supported by the declaration of Dr. Eric Weiss, who is an emergency medicine expert. See DUMF No. 17; Boggs Declaration at ¶ 14. Christina has objected to reliance on Dr. Weiss's causation opinions on the ground that he is not an infectious diseases expert and thus, is not qualified to offer these opinions. FCH's reply memorandum does not address this objection, or the causation issue in general. Further, FCH did not raise causation or address Christina's objection at the hearing on these motions. For purposes of this motion, FCH has not adequately shown that Dr. Weiss is qualified to render causation opinions and Christina's objection is sustained. Since Dr. Weiss is the only support for summary judgment on this claim under FCH's proposed undisputed facts, and FCH has not adequately shown Dr. Weiss's qualifications to give causation opinions, there is no longer a basis for this portion of FCH's motion. Summary judgment on the issue of medical malpractice causation is denied.

## CONCLUSION

Christina and FCH have moved for summary judgment on Christina's EMTALA claim, and FCH has further moved for summary judgment on Christina's medical malpractice claim. The evidence presented shows a dispute with respect to whether Christina received disparate screening. Christina's expert has found 30 patients who she contends are similarly situated to Christina, yet received superior screenings. FCH's expert has opined that he has reviewed all 287 records produced by FCH and that none reflect patients who are similarly situated to Christina and who received a superior screenings. Thus, whether the 30 patients are similarly situated to Christina, whether Christina received a disparate screening in comparison to those patients, and the credibility of the parties's experts will be determined by a jury. The parties's

1   respective motions for summary judgment on this claim are denied.[17]

2          As to Christina's medical malpractice claim, Christina is proceeding under an ostensible

3   agency theory.  On each presentation to FCH, Cora signed a Conditions Form that stated the

4   physicians are not employees or agents of FCH.  Although Cora either knew or should have

5   known that the physicians are not employees or agents of FCH, the Conditions Form does not

6   discuss physician assistants or nurse practitioners.  The notice in the Conditions Form focuses on

7   physicians.  The Conditions Form is sufficiently ambiguous with respect to nurse practitioners

8   and physician assistants that the Court cannot say as a matter of law that Christina knew or

9   should have known that the nurse practitioners and physician assistants were not the agents of

10  FCH.  Further, FCH's causation challenge is based on the testimony of Dr. Weiss.  However,

11  FCH has not answered Christina's objection to Dr. Weiss's qualifications to render causation

12  opinions in this case.  Christina's objection to Dr. Weiss's causation opinion is sustained and

13  thus, there is no longer a sufficient basis for FCH's motion as to causation.  Therefore, summary

14  judgment on this claim will be denied.

15

16         Accordingly, IT IS HEREBY ORDERED that:

17  1.     Plaintiff's motion for partial summary judgment is DENIED; and

18  2.     Defendant FCH's motion for summary judgment is DENIED.

19

20  IT IS SO ORDERED.

21  **Dated:    March 21, 2007**              **/s/ Anthony W. Ishii**
    0m8i78                                   UNITED STATES DISTRICT JUDGE
22

23

24

25

26      [17]In a footnote in her opposition, Christina argues that Judge Coyle's decision on a motion to dismiss and
    Magistrate Judge Snyder's decision to not allow an amended complaint were erroneous.  However, it is inappropriate
27  to raise disagreement with previous orders in a footnote as part of an opposition.  The propriety of prior decisions in
    this case is not before the Court and it express no opinion on the issue.

28                                          27