**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTINA ROMAR, a minor suing through her mother and legal representative, CORA ROMAR, <br><br> Plaintiff, <br> v. <br><br> FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER, and DR. THOMAS MANSFIELD, <br><br> Defendants. | 1:03-cv-6668 AWI SMS <br><br> ORDER ON APPLICATION OF THE MICRA DAMAGES CAP TO PLAINTIFF'S EMTALA CLAIM |

This is an the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA") case that stems from three presentations to Fresno Community Hospital and Medical Center's ("FCH") emergency room by minor Plaintiff Christina Romar in December 2002.  At this point in the proceedings, it has become necessary to determine whether the $250,000 non-economic damages limitation of the California Medical Injury Compensation Reform Act, California Civil Code § 3333.2 ("MICRA"), applies to Plaintiff's EMTALA disparate screening claim.  For the reasons that follow, the Court concludes that the MICRA cap does not apply to Plaintiffs' EMTALA disparate screening claims.

***Plaintiff's Argument***

Plaintiff argues that two federal district courts have held that EMTALA claims are not

subject to the severe non-economic damage limitations applicable to medical malpractice claims under MICRA. See Jackson v. East Bay Hosp., 980 F.Supp. 1341, 1344 (N.D. Cal. 1997) (*"Jackson I"*); Burrows v. Redbud Community Hosp. Dist., 188 F.R.D. 356, 358 (N.D. Cal. 1997). *Jackson I* first determined that EMTALA incorporates state damages law. It next determined that the MICRA damages cap was part of California's general tort law and that the MICRA cap was not arbitrary and not preempted by EMTALA. *Jackson I* then noted that, as recognized by the Ninth Circuit and other federal courts, EMTALA does not create a federal remedy for medical negligence, nor does it duplicate state-law medical malpractice claims; rather, it makes hospitals strictly liable. *Jackson I* observed that California law recognizes that the same set of facts may support both MICRA and non-MICRA claims; thus, the same set of facts is not necessarily based on professional negligence. Since EMTALA is not a negligence statute, *Jackson* concluded that an EMTALA cause of action is not based on professional negligence and that the MICRA cap does not apply. *Jackson I* should be followed here.

The federal cases which have applied other states' damages caps are distinguishable. The malpractice damages cap in Michigan, Indiana, and Virginia are all broader in scope than MICRA. The Fourth Circuit decision in *Brooks v. Maryland Gen. Hosp.*, 996 F.2d 708 (4th Cir. 1993) is more instructive because Maryland's damages cap is very similar to MICRA. *Brooks* concluded that the Maryland damages cap, which applied to claims based on the breach of the standard of care, did not encompass EMTALA claims. See Brooks, 996 F.2d at 713.

Finally, the California supreme court case of *Barris v. County of Los Angeles*, 20 Cal.4th 101 (1999) is not dispositive. *Barris* was expressly limited to a failure to stabilize claim, which is not present in this case. *Barris* also rejected the premise that EMTALA is not a negligence statute, despite the legion of federal cases to the contrary. Because of the many federal cases that recognize that EMTALA is not a negligence statute, *Barris* cannot be followed.

Under the rationale of *Jackson I* and *Brooks*, the Court should hold that MICRA's cap does not apply to this case.

### *FCH's Argument*

FCH argues that MICRA applies to actions for injury against a health care provider based

on professional negligence, which means a negligent act or omission by a health care provider in rendering professional services that are within the scope of services for which the provider is licensed. MICRA applies to professional conduct even if no special training, knowledge, or skill is required. As the Ninth Circuit recognized in *Taylor v. United States,* 821 F.2d 1428 (9th Cir. 1987), MICRA's application depends upon whether the duty breached falls within the services for which the health care provider is licensed.

In *Barris*, the California supreme court determined that the MICRA cap applied to the EMTALA stabilization claim before it. *Barris* recognized that most federal courts have applied a state's damages cap to EMTALA. *Barris* adopted the analytical approach of *Power v. Arlington Hosp. Assoc.*, 42 F.3d 851 (4th Cir. 1994) and held that a court is to look at the underlying conduct challenged and its legal basis to determine whether, if brought under state law, it would constitute a cause of action subject to a cap. *Power* found that Virginia's medical malpractice damages cap applied to disparate screenings.

Finally, *Jackson I* should not be followed. *Barris* rejected *Jackson I* on the basis that *Jackson I* erroneously stated that EMTALA claims do not rest on any proof that a hospital was negligent or failed to provide adequate treatment, and further erroneously held that EMTALA requires proof of a hospital's intentional refusal to provide care. Because California law determines the damages available under EMTALA and the California Supreme Court has disavowed *Jackson I*'s damages analysis, *Jackson I* should not be followed.

The MICRA cap applies in this case because Plaintiff is claiming that she was disparately screened when additional diagnostic tests were not utilized even though other patients with sufficiently similar symptoms received the tests. The failure to obtain additional testing is an act that falls within the licensing of a hospital and is based on professional judgment. Further, expert witnesses in this case are necessary to determine whether the screening received was disparate. Plaintiff's case involves professional negligence that falls under MICRA.

### ***Legal Standards***

### *Damages Under EMTALA & MICRA*

EMTALA provides in pertinent part:

3

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement [under EMTALA] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as appropriate.

42 U.S.C. § 1395dd(d)(2)(A). "By enacting this provision, Congress explicitly directed federal courts to look to state law . . . to determine both the type and amount of damages available," which may include medical malpractice damages caps. Power v. Arlington Hosp. Assoc., 42 F.3d 851, 860-63 (4th Cir. 1994); see also Smith v. Botsford Gen. Hosp., 419 F.3d 513, 518 (6th Cir. 2005); Brooks v. Maryland Gen. Hosp., 996 F.2d 708, 715 (4th Cir. 1993); Jackson v. East Bay Hosp., 980 F.Supp. 1341, 1346 (N.D. Cal. 1997); Barris v. County of Los Angeles, 20 Cal.4th 101, 111 (1999).

California has a damages cap on non-economic damages of $250,000 for claims "based on professional negligence" by health care providers. Cal. Civ. Code § 3333.2(b). In relevant part, MICRA reads:

> (a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.
> . . . . .
> (c) For the purposes of this section:
> . . . . . .
> (2) "Professional negligence" means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

Cal. Civ. Code § 3333.2(a), (c)(2). "In other contexts, the [California] Supreme Court has applied an expansive definition to the MICRA definition of 'based on professional negligence,' but it has not done so in the context of § 3333.2." Perry v. Shaw, 88 Cal.App.4th 658, 661 (2001).

"It is settled that additional causes of action may arise out of the same facts as a medical malpractice action that do not trigger MICRA." Unruh-Haxton v. Regents of University of California, 162 Cal.App.4th 343, 352 (2008); see Smith v. Ben Bennett, Inc., 133 Cal.App.4th 1507, 1514 (2005). For example, in addition to medical malpractice, causes of action against a

health care provider for "battery, products liability, premises liability, fraud, breach of contract, and intentional or negligent infliction of emotional distress" may arise from out of the same set of facts. Smith, 133 Cal.App.4th at 1515. If a plaintiff "chooses to proceed on both non-MICRA and MICRA causes of action, and obtains a recovery that may be based on a non-MICRA theory, the limitations of [MICRA] should not apply." Waters v. Bourhis, 40 Cal.3d 424, 437-38 (1985). "[W]hen a cause of action is asserted against a health care provider on a legal theory other than medical malpractice, the courts must determine whether it is nevertheless based on the 'professional negligence' of the health care provider so as to trigger MICRA." Smith,133 Cal.App.4th at 1514. The California Supreme Court adopted the analytical framework of the federal Fourth Circuit for determining whether the MICRA cap applies to a particular EMTALA claim. Barris, 20 Cal.4th at 114.

> [T]he court's task in determining whether Civil Code § 3333.2 applies to a particular kind of EMTALA claim . . . properly involves examining the legal theory underlying the particular claim and the nature of the conduct challenged to determine whether, under California law, it would constitute 'professional negligence' subject to Civil Code § 3333.2.

Id. at 116 (and holding that an EMTALA failure to stabilize claim was subject to the MICRA cap).

*Disparate Screening Under EMTALA*

EMTALA imposes a duty on a hospital, *inter alia*, to provide a patient with an "appropriate medical screening" that is designed to determine if an emergency medical condition exists. 42 U.S.C. § 1395dd(a). A hospital meets its obligation to provide an "appropriate medical screening" under EMTALA when it:

> provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.

Baker v. Adventist Health, Inc., 260 F.3d 987, 995 (9th Cir. 2001); Jackson v. East Bay Hosp., 246 F.3d 1248, 1256 (9th Cir. 2001); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258-59 (9th Cir. 1995). To recover for a disparate screening, the plaintiff must proffer evidence "sufficient to support a finding that she received a materially different screening than that

provided to others in her condition.  It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position." Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000); see also Battle v. Memorial Hosp., 228 F.3d 544, 557 (5th Cir. 2000) (noting that EMTALA liability for a screening "is not based on whether the physician . . . failed to adhere to the appropriate standard of care.").  Stated differently, "the test is whether the challenged procedure was identical to that provided [to] similarly situated patients as opposed to whether the procedure was adequate as judged by the medical profession." Eberhardt, 62 F.3d at 1258; see Summers v. Baptist Medical Ctr. of Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1993) ("Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated . . . .").  A *de minimus* deviation from a hospital's standard screening policy is insufficient to establish a violation of EMTALA.  Repp v. Anadarko Municipal Hospital, 43 F.3d 519, 523 (10th Cir. 1994).

### ***Discussion***

There is no dispute that EMTALA incorporates state law damage caps with respect to medical malpractice claims.  This means that the Court is to follow the interpretation of MICRA as made by California courts, and in particular the California Supreme Court.  See Smith, 419 F.3d at 518-19; Power, 42 F.3d at 860-61; Brooks, 996 F.2d at 712-13.  *Barris* established a framework (that utilized by the Fourth and Sixth federal circuits) for determining whether an EMTALA claim falls within MICRA's coverage.[1]  *Barris* also found that an EMTALA failure to stabilize claim fit within MICRA's coverage.[2]

---

[1] EMTALA imposes a duty to "stabilize" a detected emergency medical condition.  See 42 U.S.C. § 1395dd(b).  The term "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from the facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A).

[2] It is not clear which EMTALA claims were at issue in *Jackson I,* screening or stabilization or both.  See Jackson, 980 F.Supp. at 1350.  To the extent that *Jackson I* concludes that MICRA does not apply to an EMTALA failure to stabilize claim, that conclusion is contrary to *Barris*.  Whatever conduct may be covered by MICRA's definition of "based on professional negligence," the California Supreme Court interprets the term to embrace conduct that constitutes a failure to stabilize under EMTALA.

6

Here, Plaintiff's EMTALA claim is that of disparate screening, not a failure to stabilize.[3] Plaintiff and her expert have identified 30 individuals whom she contends presented to FCH with the same key symptoms that she herself had. Plaintiff contends that each of these 30 patients received a superior screening in that they each received various diagnostic tests, but she received none. Since Plaintiff did not receive the same screening as those who were similarly symptomed, she did not receive FCH's "standard screening" and was thus, disparately screened. The parties do not dispute that screening is a professional medical service. Further, there has been no dispute that the provision of a medical screening is within the scope of services for which FCH is licensed. The dispute in this case is whether a disparate screening is a negligent act or omission.

"Negligence is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do; moreover it is not absolute or intrinsic, but always relative to some circumstance of time, place or person." Richardson v. Kier, 34 Cal. 63, 75 (1867). Consistent with this understanding of negligence, *Barris* stated that the "cap on damages under Civil Code § 3333.2 applies to injuries 'based on professional negligence,' i.e. *medical treatment falling below the professional standard of care*." Barris, 20 Cal.4th at 113 (emphasis added). "[A] 'malpractice' action brought on a non-negligence theory would apparently be without the ambit of [MICRA]." Id. at 116 n.9 (quoting parenthetically *Review of Selected 1975 California Legislation*, 7 Pacific L.J. 544, 557 (1976)).

Numerous federal courts have indicated that EMTALA screening claims are not negligence claims. E.g., Del Carmen v. Agosto, 299 F.3d 15, 21 (1st Cir. 2002) (noting that "whereas malpractice liability usually attaches when a health care provider fails to adhere to a 'general professional standard of care,' . . . EMTALA only requires 'an appropriate medical screening examination within the capability of the hospital's emergency department.'"); Jackson, 246 F.3d at 1256 ("The statutory language of the EMTALA clearly declines to impose on

---

[3] Plaintiff also alleged a EMTALA "cursory screening" claim, i.e. a screening that is so cursory that it is not designed to detect emergency conditions, see Baker, 260 F.3d at 995, but that claim was dismissed earlier in the litigation. The issue before the Court is whether MICRA applies to Plaintiff's "disparate screening" claim. The Court does not express an opinion regarding MICRA's potential application to a "cursory screening" claim.

7

hospitals a national standard of care in screening patients."); Battle, 228 F.3d at 557; Summers, 91 F.3d at 1137-38; Eberhardt, 62 F.3d at 1258; Baber v. Hospital Corp. of Am., 977 F.2d 872, 879-80 (4th Cir. 1992); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("Nevertheless, we decline the appellant's invitation to incorporate a malpractice or negligence standard into subsection 1395dd(a)."); Cleland v. Bronson Health Care Group, 917 F.2d 266, 272 (6th Cir. 1990) (holding that a medical screening exam within the hospital's capabilities "precludes resort to a malpractice or other objective standard of care as [to] the meaning of the term 'appropriate.'"). EMTALA is designed to provide a remedy for those patients whom a hospital "dumped," that is those whom a hospital turned away without first providing an examination or those whom the hospital transferred without stabilizing an emergency medical condition. See Jackson, 246 F.3d at 1256; Brooks, 996 F.2d at 710. "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." Power, 42 F.3d at 856; see Baker, 260 F.3d at 993. Nor was EMTALA intended "to create a negligence standard based on each hospital's capability." Agosto, 299 F.3d at 21; Baber, 977 F.2d at 880.

As stated above, under a disparate screening theory, FCH's conduct is not judged against the prevailing professional standard of care. See Battle, 228 F.3d at 557; Reynolds, 218 F.3d at 84; Summers, 91 F.3d at 1138; Eberhardt, 62 F.3d at 1258; Cleland, 917 F.2d at 272. Rather, FCH's conduct is compared to its own individualized screening standards or protocols in order to determine if Christina Romar received the same screening as other similarly symptomed patients. See id. For this reason, a hospital with "low standards" may comply with its EMTALA screening obligation by treating a plaintiff like every other patient, but at the same time violate state medical negligence law because the care falls below the professional medical standard of care. See Rivera v. Doctors Ctr. Hosp., Inc., 247 F.Supp.2d 90, 102 (D. P.R. 2003); Jones v. Wake County Hosp. System, Inc., 786 F.Supp. 538, 545 (E.D. N.C. 1991). It is also theoretically possible for a hospital with "high standards" to violate EMTALA because it treated a plaintiff differently, but at the same time comply with state medical malpractice law because the care

provided exceeded the professional standard of care. The key is whether Plaintiff was treated differently, it is not whether FCH breached the standard of professional medical care, i.e. did not act like a reasonable hospital under the circumstances. See Battle, 228 F.3d at 557; Reynolds, 218 F.3d at 84; Eberhardt, 62 F.3d at 1258; Cleland, 917 F.2d at 272. Plaintiff may recover for her disparate screening claim without ever describing the care that a reasonable hospital in FCH's positioned would have given to her. Cf. Agosto, 299 F.3d at 21; Reynolds, 218 F.3d at 84; Eberhardt, 62 F.3d at 1258; Cleland, 917 F.2d at 272 with Barris, 20 Cal.4th at 108 n.1 ("The standard of care in a medical malpractice case requires that medical service providers exercise that . . . degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances."). A disparate screening claim is not a negligence claim because it is based on disparate treatment and does not involve the professional medical standard of care/how a reasonable hospital in FCH's position would act. Cf. Agosto, 299 F.3d at 21; Reynolds, 281 F.3d at 84; Eberhardt, 62 F.3d at 1258; Brooks, 996 F.2d at 713; Cleland, 917 F.2d at 277 with Barris, 20 Cal.4th at 108 n.1, 113-14; Richardson, 34 Cal. at 75.

Although the MICRA cap has been applied to conduct that may not necessarily be viewed as traditional medical malpractice, e.g., Canister v. Emergency Ambulance Service, Inc., 160 Cal.App.4th 388, 406-07 (2008) (MICRA applicable to driving an ambulance), FCH has cited no cases that apply the MICRA cap where "the professional standard of care" was something other than "that degree of skill of knowledge, and care ordinarily possessed by members of [the] profession." Cf. Barris, 20 Cal.4th at 108 n.1. For example, the *Barris* court found that a failure to stabilize claim was "inextricably interwoven" with the professional standard of care for rendering medical treatment.[4] See id. at 114. *Barris* explained:

> The cap on damages under Civil Code section 3333.2 applies to injuries *'based on professional negligence,' i.e., medical treatment falling below the professional standard of care*. As discussed, although it is not identical to a state malpractice claim because it includes additional requirements, an EMTALA claim for failure to stabilize is 'based on professional negligence.' A plaintiff must prove that the hospital did not, within its available staff and facilities, provide a patient known to

---

[4]*Barris* expressly stated, "Because Barris's medical screening claim was dismissed, we express no opinion on the question whether such a claim would be subject to limitations on damages under MICRA." Barris, 20 Cal.4th at 111 n.4.

9

> be suffering from an emergency medical condition with medical treatment necessary to assure, within reasonable medical probability, that no deterioration of the condition would likely occur. The standard of 'reasonable medical probability' is an objective one, inextricably interwoven with the professional standard for rendering medical treatment.

Id. at 113-14 (emphasis added).  In contrast, a disparate screening claim does not involve any claim of "reasonable medical probability" with which the prevailing medical standard of care may become intertwined; the focus is on disparate treatment.  See Battle, 228 F.3d at 557; Reynolds, 218 F.3d at 84; Eberhardt, 62 F.3d at 1258; Brooks, 996 F.2d at 713.

      Similarly, in *Hedlund v. Superior Court*, 34 Cal.3d 695 (1983), the court found that the MICRA cap applied to the *Tarasoff* claim of a plaintiff against a psychotherapist who failed to warn her of the danger that a patient posed to the plaintiff.  The duty of a psychotherapist to warn a third party victim was created by the California Supreme Court in *Tarasoff*.  See Hedlund, 34 Cal.3d at 700.  The *Tarasoff* duty consisted of two parts: "the therapist has a duty first to exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances' in predicting whether the patient poses a serious danger to others, and second, 'to exercise reasonable care to protect the foreseeable victim of that danger.'"  Id..  The California Supreme Court rejected an argument that, because the actual duty to warn was based on ordinary negligence (as opposed to professional negligence), MICRA should not apply.  Instead, *Hedlund* agreed with the argument that the "cause of action sounds in professional negligence because the duty imposed on a therapist is first to diagnose or recognize the danger posed by the patient and only then to warn.  The warning aspect of this duty . . . is inextricably interwoven with the diagnostic function."  Id. at 703.  Again, in the case at bar, the comparison is between the screening received by Plaintiff at FCH and the screening that similarly symptomed patients receive at FCH.  Since the professional standard of care is not incorporated into the duty to provide materially similar screenings, see Battle, 228 F.3d at 557; Reynolds, 218 F.3d at 54; Eberhardt, 62 F.3d at 1258; Cleland, 917 F.2d at 272, the professional standard of care is not inextricably intertwined.

      In *Canister*, a police officer was accompanying an arrestee/patient in the back of an ambulance that was being driven by an EMT.  Canister, 160 Cal.App.4th at 392-93.  In response

to other traffic, the EMT swerved the ambulance into the sidewalk and injured the police officer. See id. at 393. The *Canister* court found that an EMT's operation of an ambulance was within the purview of MICRA. See id. In finding that the MICRA cap applied, *Canister* noted that "professional negligence" meant "*negligence* occurring during the rendering of services for which the health care provider is licensed." Id. (emphasis added). Thus, *Canister* recognized that "professional negligence" was still a form of *negligence*. See id. In fact, unlike the case at bar, the claim against the EMT was a pure negligence claim. See id. at 393 ("Appellant contended the ambulance was negligently driven and both driver and attendant should have informed him of the availability of the seatbelts."). There is no indication in *Canister* that a claim other than negligence was at issue or that the EMT's conduct would have been measured against anything other than the community standards of reasonableness/care (as opposed to whether the EMT followed his unique standard practice as to the police officer and arrestee).

Finally, in *Taylor*, the Ninth Circuit held that the "government had a professional duty to prevent Taylor's husband from becoming separated from his ventilator, regardless of whether separation was caused by the ill-considered decision of a physician or the accidental bump of a janitor's broom. Civil Code § 3333.2 applies to this case." Taylor, 821 F.2d at 1432. However, *Taylor* recognized that every hospital, as part of its services, "has a duty to 'use reasonable care and diligence in safeguarding a patient committed to its charge . . . .'" Id. (quoting Murillo v. Good Samaritan Hosp., 99 Cal.App.3d 50, 55, 57 (1979)). Unlike the case at bar, it appears that Taylor's claim against that hospital was a pure negligence claim. See id. at 1430 ("The district court concluded that Taylor's claims were based on ordinary 'common law' negligence rather than professional negligence . . . ."). Thus, *Taylor* involved the general professional standard of care applicable to all hospitals – in essence "that degree of skill of knowledge, and care ordinarily possessed by members of [the] profession." Cf. Barris, 20 Cal.4th at 108 n.1. The unique protocols of that hospital, or whether the patient received the same care that the particular hospital gives to other similar patients, was not relevant.

It is possible for the same conduct to form the basis of MICRA and non-MICRA applicable claims against a health care provider, and when a Plaintiff chooses to proceed on the

11

non-MICRA claims, the provisions of MICRA are not applicable. See Waters, 40 Cal.3d at 437-38; Unruh-Haxton, 162 Cal.App.4th at 352; Smith, 133 Cal.App.4th at 1514; Perry, 88 Cal.App.4th at 661.  Likewise, it is possible for a screening to violate EMTALA, but not California medical malpractice law, and vice versa.  See Jones, 786 F.Supp. at 545. Although a medical screening may be a service provided by a hospital, the provision of a screening is not governed by the standards of knowledge, care, and skill of members of the medical profession; a disparate screening claim is based on disparate treatment.  See Agosto, 299 F.3d at 21; Battle, 228 F.3d at 557; Reynolds, 218 F.3d at 84; Eberhardt, 62 F.3d at 1258; cf. Jackson, 980 F.Supp. at 1348-50; Barris, 20 Cal.4th at 113-14, 116.  To adopt FCH's position would in essence "create a negligence standard based on each hospital's capability," but that is not what "Congress intended." Agosto, 299 F.3d at 21; Baber, 977 F.2d at 880.  If anything, disparate screening may be "a 'malpractice' action brought on a . . . non-negligence theory," which is outside "the ambit of [MICRA]."  Barris, 20 Cal.4th at 116 n.9.  Because FCH has not sufficiently shown in this case that Plaintiff's EMTALA disparate screening claim is one "based on professional negligence," the MICRA damages cap does not apply.[5]  Cf. id.; Brooks, 996 F.2d at 713 ("Because Brooks' EMTALA claim is aimed at disparate screening and the Maryland Malpractice Act applies only to claims that the standard of care in the community has been breached, we hold that the Maryland Malpractice Act does not apply . . . .").

Accordingly, IT IS HEREBY ORDERED that the MICRA cap does not apply to Plaintiff's EMTALA disparate screening claims.

IT IS SO ORDERED.

**Dated:   October 10, 2008**               **/s/ Anthony W. Ishii**
                                            CHIEF UNITED STATES DISTRICT JUDGE

---

[5] In reply, FCH argues that EMTALA can be viewed in terms of negligence per se.  "Negligence per se" is an evidentiary doctrine that creates a presumption of negligence and that is codified at California Evidence Code § 669.  Quiroz v. Seventh Ave. Center, 140 Cal. App. 4th 1256, 1286 (2006).  If the presumption is established, it may be rebutted by proof that "the person violating the statute . . . did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."  Id.  The Court is unaware of any decision that allows a hospital to defend against a disparate screening claim by showing that it did what might be expected of a hospital of ordinary prudence under the circumstances.